(Slip Opinion) OCTOBER TERM, 2014 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PEREZ, SECRETARY OF LABOR, ET AL. *v.* MORTGAGE BANKERS ASSOCIATION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 13–1041. Argued December 1, 2014—Decided March 9, 2015[*]

The Administrative Procedure Act (APA) establishes the procedures federal administrative agencies use for "rule making," defined as the process of "formulating, amending, or repealing a rule." 5 U. S. C. §551(5). The APA distinguishes between two types of rules: So-called "legislative rules" are issued through notice-and-comment rulemaking, see §§553(b), (c), and have the "force and effect of law," *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 302–303. "Interpretive rules," by contrast, are "issued . . . to advise the public of the agency's construction of the statutes and rules which it administers," *Shalala* v. *Guernsey Memorial Hospital*, 514 U. S. 87, 99, do not require notice-and-comment rulemaking, and "do not have the force and effect of law," *ibid.*

In 1999 and 2001, the Department of Labor's Wage and Hour Division issued letters opining that mortgage-loan officers do not qualify for the administrative exemption to overtime pay requirements under the Fair Labor Standards Act of 1938. In 2004, the Department issued new regulations regarding the exemption. Respondent Mortgage Bankers Association (MBA) requested a new interpretation of the revised regulations as they applied to mortgage-loan officers, and in 2006, the Wage and Hour Division issued an opinion letter finding that mortgage-loan officers fell within the administrative exemption under the 2004 regulations. In 2010, the Department again altered its interpretation of the administrative exemption. Without notice or an opportunity for comment, the Department withdrew the 2006

——————

[*]Together with No. 13–1052, *Nickols et al.* v. *Mortgage Bankers Association*, also on certiorari to the same court.

opinion letter and issued an Administrator's Interpretation conclud-
ing that mortgage-loan officers do not qualify for the administrative
exemption.

  MBA filed suit contending, as relevant here, that the Administra-
tor's Interpretation was procedurally invalid under the D. C. Circuit's
decision in *Paralyzed Veterans of Am.* v. *D. C. Arena L. P.*, 117 F. 3d
579. The *Paralyzed Veterans* doctrine holds that an agency must use
the APA's notice-and-comment procedures when it wishes to issue a
new interpretation of a regulation that deviates significantly from a
previously adopted interpretation. The District Court granted sum-
mary judgment to the Department, but the D. C. Circuit applied *Par-
alyzed Veterans* and reversed.

*Held*: The *Paralyzed Veterans* doctrine is contrary to the clear text of
the APA's rulemaking provisions and improperly imposes on agencies
an obligation beyond the APA's maximum procedural requirements.
Pp. 6–14.

  (a) The APA's categorical exemption of interpretive rules from
the notice-and-comment process is fatal to the *Paralyzed Veterans*
doctrine. The D. C. Circuit's reading of the APA conflates the differ-
ing purposes of §§1 and 4 of the Act. Section 1 requires agencies to
use the same procedures when they amend or repeal a rule as they
used to issue the rule, see 5 U. S. C. §551(5), but it does not say what
procedures an agency must use when it engages in rulemaking. That
is the purpose of §4. And §4 specifically exempts interpretive rules
from notice-and-comment requirements. Because an agency is not
required to use notice-and-comment procedures to issue an initial in-
terpretive rule, it is also not required to use those procedures to
amend or repeal that rule. Pp. 7–8.

  (b) This straightforward reading of the APA harmonizes with
longstanding principles of this Court's administrative law jurispru-
dence, which has consistently held that the APA "sets forth the full
extent of judicial authority to review executive agency action for pro-
cedural correctness," *FCC* v. *Fox Television Stations, Inc.*, 556 U. S.
502, 513. The APA's rulemaking provisions are no exception: §4 es-
tablishes "the maximum procedural requirements" that courts may
impose upon agencies engaged in rulemaking. *Vermont Yankee Nu-
clear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435
U. S. 519, 524. By mandating notice-and-comment procedures when
an agency changes its interpretation of one of the regulations it en-
forces, *Paralyzed Veterans* creates a judge-made procedural right that
is inconsistent with Congress' standards. Pp. 8–9.

  (c) MBA's reasons for upholding the *Paralyzed Veterans* doctrine
are unpersuasive. Pp. 9–14.

  (1) MBA asserts that an agency interpretation of a regulation

Syllabus

that significantly alters the agency's prior interpretation effectively amends the underlying regulation. That assertion conflicts with the ordinary meaning of the words "amend" and "interpret," and it is impossible to reconcile with the longstanding recognition that interpretive rules do not have the force and effect of law. MBA's theory is particularly odd in light of the limitations of the *Paralyzed Veterans* doctrine, which applies only when an agency has previously adopted an interpretation of its regulation. MBA fails to explain why its argument regarding revised interpretations should not also extend to the agency's first interpretation. *Christensen* v. *Harris County*, 529 U. S. 576, and *Shalala* v. *Guernsey Memorial Hospital*, 514 U. S. 87, distinguished. Pp. 9–12.

(2) MBA also contends that the *Paralyzed Veterans* doctrine reinforces the APA's goal of procedural fairness. But the APA already provides recourse to regulated entities from agency decisions that skirt notice-and-comment provisions by placing a variety of constraints on agency decisionmaking, *e.g.*, the arbitrary and capricious standard. In addition, Congress may include safe-harbor provisions in legislation to shelter regulated entities from liability when they rely on previous agency interpretations. See, *e.g.*, 29 U. S. C. §§259(a), (b)(1). Pp. 12–13.

(3) MBA has waived its argument that the 2010 Administrator's Interpretation should be classified as a legislative rule. From the beginning, this suit has been litigated on the understanding that the Administrator's Interpretation is an interpretive rule. Neither the District Court nor the Court of Appeals addressed this argument below, and MBA did not raise it here in opposing certiorari. P. 14.

720 F. 3d 966, reversed.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined, and in which ALITO, J., joined except for Part III–B. ALITO, J., filed an opinion concurring in part and concurring in the judgment. SCALIA, J., and THOMAS, J., filed opinions concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 13–1041 and 13–1052

---

### THOMAS E. PEREZ, SECRETARY OF LABOR, ET AL., PETITIONERS
13–1041                *v.*
### MORTGAGE BANKERS ASSOCIATION ET AL.


### JEROME NICKOLS, ET AL., PETITIONERS
13–1052                *v.*
### MORTGAGE BANKERS ASSOCIATION

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 9, 2015]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

When a federal administrative agency first issues a rule interpreting one of its regulations, it is generally not required to follow the notice-and-comment rulemaking procedures of the Administrative Procedure Act (APA or Act). See 5 U. S. C. §553(b)(A). The United States Court of Appeals for the District of Columbia Circuit has nevertheless held, in a line of cases beginning with *Paralyzed Veterans of Am.* v. *D. C. Arena L. P.*, 117 F. 3d 579 (1997), that an agency must use the APA's notice-and-comment procedures when it wishes to issue a new interpretation of a regulation that deviates significantly from one the agency has previously adopted. The question in these cases is whether the rule announced in *Paralyzed Veterans* is consistent with the APA. We hold that it is not.

### I
### A

The APA establishes the procedures federal administrative agencies use for "rule making," defined as the process of "formulating, amending, or repealing a rule." §551(5). "Rule," in turn, is defined broadly to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy." §551(4).

Section 4 of the APA, 5 U. S. C. §553, prescribes a three-step procedure for so-called "notice-and-comment rulemaking." First, the agency must issue a "[g]eneral notice of proposed rule making," ordinarily by publication in the Federal Register. §553(b). Second, if "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." §553(c). An agency must consider and respond to significant comments received during the period for public comment. See *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 416 (1971); *Thompson* v. *Clark*, 741 F. 2d 401, 408 (CADC 1984). Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose." §553(c). Rules issued through the notice-and-comment process are often referred to as "legislative rules" because they have the "force and effect of law." *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 302–303 (1979) (internal quotation marks omitted).

Not all "rules" must be issued through the notice-and-comment process. Section 4(b)(A) of the APA provides that, unless another statute states otherwise, the notice-and-comment requirement "does not apply" to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U. S. C. §553(b)(A). The term "interpretative rule," or "interpre-

tive rule,"[1] is not further defined by the APA, and its precise meaning is the source of much scholarly and judicial debate. See generally Pierce, Distinguishing Legislative Rules From Interpretative Rules, 52 Admin. L. Rev. 547 (2000); Manning, Nonlegislative Rules, 72 Geo. Wash. L. Rev. 893 (2004). We need not, and do not, wade into that debate here. For our purposes, it suffices to say that the critical feature of interpretive rules is that they are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala* v. *Guernsey Memorial Hospital*, 514 U. S. 87, 99 (1995) (internal quotation marks omitted). The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Ibid.*

B

These cases began as a dispute over efforts by the Department of Labor to determine whether mortgage-loan officers are covered by the Fair Labor Standards Act of 1938 (FLSA), 52 Stat. 1060, as amended, 29 U. S. C. §201 *et seq.* The FLSA "establishe[s] a minimum wage and overtime compensation for each hour worked in excess of 40 hours in each workweek" for many employees. *Integrity Staffing Solutions, Inc.* v. *Busk*, 574 U. S. ___, ___ (2014) (slip op., at 3). Certain classes of employees, however, are exempt from these provisions. Among these exempt individuals are those "employed in a bona fide executive, administrative, or professional capacity . . . or in the capacity of outside salesman . . . ." §213(a)(1). The

_____

[1] The latter is the more common phrasing today, and the one we use throughout this opinion.

exemption for such employees is known as the "administrative" exemption.

The FLSA grants the Secretary of Labor authority to "defin[e]" and "delimi[t]" the categories of exempt administrative employees. *Ibid.* The Secretary's current regulations regarding the administrative exemption were promulgated in 2004 through a notice-and-comment rulemaking. As relevant here, the 2004 regulations differed from the previous regulations in that they contained a new section providing several examples of exempt administrative employees. See 29 CFR §541.203. One of the examples is "[e]mployees in the financial services industry," who, depending on the nature of their day-to-day work, "generally meet the duties requirements for the administrative exception." §541.203(b). The financial services example ends with a caveat, noting that "an employee whose primary duty is selling financial products does not qualify for the administrative exemption." *Ibid.*

In 1999 and again in 2001, the Department's Wage and Hour Division issued letters opining that mortgage-loan officers do not qualify for the administrative exemption. See Opinion Letter, Loan Officers/Exempt Status, 6A LRR, Wages and Hours Manual 99:8351 (Feb. 16, 2001); Opinion Letter, Mortgage Loan Officers/Exempt Status, *id.,* at 99:8249. (May 17, 1999). In other words, the Department concluded that the FLSA's minimum wage and maximum hour requirements applied to mortgage-loan officers. When the Department promulgated its current FLSA regulations in 2004, respondent Mortgage Bankers Association (MBA), a national trade association representing real estate finance companies, requested a new opinion interpreting the revised regulations. In 2006, the Department issued an opinion letter finding that mortgage-loan officers fell within the administrative exemption under the 2004 regulations. See App. to Pet. for Cert. in No. 13–1041, pp. 70a–84a. Four years later, however, the

Wage and Hour Division again altered its interpretation of the FLSA's administrative exemption as it applied to mortgage-loan officers. *Id.,* at 49a–69a. Reviewing the provisions of the 2004 regulations and judicial decisions addressing the administrative exemption, the Department's 2010 Administrator's Interpretation concluded that mortgage-loan officers "have a primary duty of making sales for their employers, and, therefore, do not qualify" for the administrative exemption. *Id.,* at 49a, 69a. The Department accordingly withdrew its 2006 opinion letter, which it now viewed as relying on "misleading assumption[s] and selective and narrow analysis" of the exemption example in §541.203(b). *Id.,* at 68a. Like the 1999, 2001, and 2006 opinion letters, the 2010 Administrator's Interpretation was issued without notice or an opportunity for comment.

C

MBA filed a complaint in Federal District Court challenging the Administrator's Interpretation. MBA contended that the document was inconsistent with the 2004 regulation it purported to interpret, and thus arbitrary and capricious in violation of §10 of the APA, 5 U. S. C. §706. More pertinent to this case, MBA also argued that the Administrator's Interpretation was procedurally invalid in light of the D. C. Circuit's decision in *Paralyzed Veterans*, 117 F. 3d 579. Under the *Paralyzed Veterans* doctrine, if "an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish" under the APA "without notice and comment." *Alaska Professional Hunters Assn., Inc.* v. *FAA*, 177 F. 3d 1030, 1034 (CADC 1999). Three former mortgage-loan officers—Beverly Buck, Ryan Henry, and Jerome Nickols—subsequently intervened in the

case to defend the Administrator's Interpretation.[2]

The District Court granted summary judgment to the Department. *Mortgage Bankers Assn.* v. *Solis*, 864 F. Supp. 2d 193 (DC 2012). Though it accepted the parties' characterization of the Administrator's Interpretation as an interpretive rule, *id.,* at 203, n. 7, the District Court determined that the *Paralyzed Veterans* doctrine was inapplicable because MBA had failed to establish its reliance on the contrary interpretation expressed in the Department's 2006 opinion letter. The Administrator's Interpretation, the District Court further determined, was fully supported by the text of the 2004 FLSA regulations. The court accordingly held that the 2010 interpretation was not arbitrary or capricious.[3]

The D. C. Circuit reversed. *Mortgage Bankers Assn.* v. *Harris*, 720 F. 3d 966 (2013). Bound to the rule of *Paralyzed Veterans* by precedent, the Court of Appeals rejected the Government's call to abandon the doctrine. 720 F. 3d., at 967, n. 1. In the court's view, "[t]he only question" properly before it was whether the District Court had erred in requiring MBA to prove that it relied on the Department's prior interpretation. *Id.,* at 967. Explaining that reliance was not a required element of the *Paralyzed Veterans* doctrine, and noting the Department's concession that a prior, conflicting interpretation of the 2004 regulations existed, the D. C. Circuit concluded that the 2010 Administrator's Interpretation had to be vacated.

We granted certiorari, 573 U. S. __ (2014), and now reverse.

## II

The *Paralyzed Veterans* doctrine is contrary to the clear

---

[2] Buck, Henry, and Nickols are petitioners in No. 13–1052 and respondents in No. 13–1041.

[3] MBA did not challenge this aspect of the District Court's decision on appeal.

text of the APA's rulemaking provisions, and it improperly imposes on agencies an obligation beyond the "maximum procedural requirements" specified in the APA, *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 524 (1978).

A

The text of the APA answers the question presented. Section 4 of the APA provides that "notice of proposed rule making shall be published in the Federal Register." 5 U. S. C. §553(b). When such notice is required by the APA, "the agency shall give interested persons an opportunity to participate in the rule making." §553(c). But §4 further states that unless "notice or hearing is required by statute," the Act's notice-and-comment requirement "does not apply . . . to interpretative rules." §553(b)(A). This exemption of interpretive rules from the notice-and-comment process is categorical, and it is fatal to the rule announced in *Paralyzed Veterans*.

Rather than examining the exemption for interpretive rules contained in §4(b)(A) of the APA, the D. C. Circuit in *Paralyzed Veterans* focused its attention on §1 of the Act. That section defines "rule making" to include not only the initial issuance of new rules, but also "repeal[s]" or "amend[ments]" of existing rules. See §551(5). Because notice-and-comment requirements may apply even to these later agency actions, the court reasoned, "allow[ing] an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment" would undermine the APA's procedural framework. 117 F. 3d, at 586.

This reading of the APA conflates the differing purposes of §§1 and 4 of the Act. Section 1 defines what a rulemaking is. It does not, however, say what procedures an agency must use when it engages in rulemaking. That is the purpose of §4. And §4 specifically exempts interpretive

rules from the notice-and-comment requirements that apply to legislative rules. So, the D. C. Circuit correctly read §1 of the APA to mandate that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance. See *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 515 (2009) (the APA "make[s] no distinction . . . between initial agency action and subsequent agency action undoing or revising that action"). Where the court went wrong was in failing to apply that accurate understanding of §1 to the exemption for interpretive rules contained in §4: Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.

B

The straightforward reading of the APA we now adopt harmonizes with longstanding principles of our administrative law jurisprudence. Time and again, we have reiterated that the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *Fox Television Stations, Inc.*, 556 U. S., at 513. Beyond the APA's minimum requirements, courts lack authority "to impose upon [an] agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." *Vermont Yankee*, 435 U. S., at 549. To do otherwise would violate "the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Id.,* at 544.

These foundational principles apply with equal force to the APA's procedures for rulemaking. We explained in *Vermont Yankee* that §4 of the Act "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." *Id.,* at 524. "Agencies are free to

grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them." *Ibid.*

The *Paralyzed Veterans* doctrine creates just such a judge-made procedural right: the right to notice and an opportunity to comment when an agency changes its interpretation of one of the regulations it enforces. That requirement may be wise policy. Or it may not. Regardless, imposing such an obligation is the responsibility of Congress or the administrative agencies, not the courts. We trust that Congress weighed the costs and benefits of placing more rigorous procedural restrictions on the issuance of interpretive rules. See *id.,* at 523 (when Congress enacted the APA, it "settled long-continued and hard-fought contentions, and enact[ed] a formula upon which opposing social and political forces have come to rest" (internal quotation marks omitted)). In the end, Congress decided to adopt standards that permit agencies to promulgate freely such rules—whether or not they are consistent with earlier interpretations. That the D. C. Circuit would have struck the balance differently does not permit that court or this one to overturn Congress' contrary judgment. Cf. *Law* v. *Siegel*, 571 U. S. ___, ___ (2014) (slip op., at 11).

## III

MBA offers several reasons why the *Paralyzed Veterans* doctrine should be upheld. They are not persuasive.

## A

MBA begins its defense of the *Paralyzed Veterans* doctrine by attempting to bolster the D. C. Circuit's reading of the APA. "*Paralyzed Veterans,*" MBA contends, "simply acknowledges the reality that where an agency significantly alters a prior, definitive interpretation of a regulation, it

has effectively amended the regulation itself," something that under the APA requires use of notice-and-comment procedures. Brief for Respondent 20–21.

The act of "amending," however, in both ordinary parlance and legal usage, has its own meaning separate and apart from the act of "interpreting." Compare Black's Law Dictionary 98 (10th ed. 2014) (defining "amend" as "[t]o change the wording of" or "formally alter . . . by striking out, inserting, or substituting words"), with *id.,* at 943 (defining "interpret" as "[t]o ascertain the meaning and significance of thoughts expressed in words"). One would not normally say that a court "amends" a statute when it interprets its text. So too can an agency "interpret" a regulation without "effectively amend[ing]" the underlying source of law. MBA does not explain *how*, precisely, an interpretive rule changes the regulation it interprets, and its assertion is impossible to reconcile with the longstanding recognition that interpretive rules do not have the force and effect of law. See *Chrysler Corp.*, 441 U. S., at 302, n. 31 (citing Attorney General's Manual on the Administrative Procedure Act 30, n. 3 (1947)); *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944).

MBA's "interpretation-as-amendment" theory is particularly odd in light of the limitations of the *Paralyzed Veterans* doctrine. Recall that the rule of *Paralyzed Veterans* applies only when an agency has previously adopted an interpretation of its regulation. Yet in that initial interpretation as much as all that come after, the agency is giving a definite meaning to an ambiguous text—the very act MBA insists requires notice and comment. MBA is unable to say why its arguments regarding revised interpretations should not also extend to the agency's first interpretation.[4]

_____

[4]MBA alternatively suggests that interpretive rules have the force of law because an agency's interpretation of its own regulations may be

Next, MBA argues that the *Paralyzed Veterans* doctrine is more consistent with this Court's "functional" approach to interpreting the APA. Relying on *Christensen* v. *Harris County*, 529 U. S. 576 (2000), and *Shalala* v. *Guernsey Memorial Hospital*, 514 U. S. 87, MBA contends that we have already recognized that an agency may not "avoid notice-and-comment procedures by cloaking its actions in the mantle of mere 'interpretation.'" Brief for Respondent 23–24.

Neither of the cases MBA cites supports its argument. Our decision in *Christensen* did not address a change in agency interpretation. Instead, we there refused to give deference to an agency's interpretation of an unambiguous regulation, observing that to defer in such a case would allow the agency "to create *de facto* a new regulation." 529 U. S., at 588. Put differently, *Christensen* held that the agency interpretation at issue was substantively invalid because it conflicted with the text of the regulation the agency purported to interpret. That holding is irrelevant to this suit and to the *Paralyzed Veterans* rule, which assesses whether an agency interpretation is *procedurally* invalid.

———————

entitled to deference under *Auer* v. *Robbins*, 519 U. S. 452 (1997), and *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410 (1945). Even in cases where an agency's interpretation receives *Auer* deference, however, it is the court that ultimately decides whether a given regulation means what the agency says. Moreover, *Auer* deference is not an inexorable command in all cases. See *Christopher* v. *SmithKline Beecham Corp.*, 567 U. S. ___, ___ (2012) (slip op., at 10) (*Auer* deference is inappropriate "when the agency's interpretation is plainly erroneous or inconsistent with the regulation" or "when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment" (internal quotation marks omitted)); *Thomas Jefferson Univ.* v. *Shalala*, 512 U. S. 504, 515 (1994) ("[A]n agency's interpretation of a . . . regulation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently held agency view" (internal quotation marks omitted)).

As for *Guernsey*, that case is fully consistent with—indeed, confirms—what the text of the APA makes plain: "Interpretive rules do not require notice and comment." 514 U. S., at 99. Sidestepping this inconvenient language, MBA instead quotes a portion of the Court's opinion stating that "APA rulemaking would still be required if [an agency] adopted a new position inconsistent with . . . existing regulations." *Id.,* at 100. But the statement on which MBA relies is dictum. Worse, it is dictum taken out of context. The "regulations" to which the Court referred were two provisions of the Medicare reimbursement scheme. And it is apparent from the Court's description of these regulations in Part II of the opinion that they were legislative rules, issued through the notice-and-comment process. See *id.,* at 91–92 (noting that the disputed regulations were codified in the Code of Federal Regulations). Read properly, then, the cited passage from *Guernsey* merely means that "an agency may only change its interpretation if the revised interpretation is consistent with the underlying regulations." Brief for Petitioners in No. 13–1052, p. 44.

B

In the main, MBA attempts to justify the *Paralyzed Veterans* doctrine on practical and policy grounds. MBA contends that the doctrine reinforces the APA's goal of "procedural fairness" by preventing agencies from unilaterally and unexpectedly altering their interpretation of important regulations. Brief for Respondent 16.

There may be times when an agency's decision to issue an interpretive rule, rather than a legislative rule, is driven primarily by a desire to skirt notice-and-comment provisions. But regulated entities are not without recourse in such situations. Quite the opposite. The APA contains a variety of constraints on agency decisionmaking—the arbitrary and capricious standard being among

the most notable. As we held in *Fox Television Stations*, and underscore again today, the APA requires an agency to provide more substantial justification when "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary and capricious to ignore such matters." 556 U. S., at 515 (citation omitted); see also *id.,* at 535 (KENNEDY, J., concurring in part and concurring in judgment).

In addition, Congress is aware that agencies sometimes alter their views in ways that upset settled reliance interests. For that reason, Congress sometimes includes in the statutes it drafts safe-harbor provisions that shelter regulated entities from liability when they act in conformance with previous agency interpretations. The FLSA includes one such provision: As amended by the Portal-to-Portal Act of 1947, 29 U. S. C. §251 *et seq.,* the FLSA provides that "no employer shall be subject to any liability" for failing "to pay minimum wages or overtime compensation" if it demonstrates that the "act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation" of the Administrator of the Department's Wage and Hour Division, even when the guidance is later "modified or rescinded." §§259(a), (b)(1). These safe harbors will often protect parties from liability when an agency adopts an interpretation that conflicts with its previous position.[5]

_____

[5] The United States acknowledged at argument that even in situations where a statute does not contain a safe-harbor provision similar to the one included in the FLSA, an agency's ability to pursue enforcement actions against regulated entities for conduct in conformance with prior agency interpretations may be limited by principles of retroactivity. See Tr. of Oral Arg. 44–45. We have no occasion to consider how such principles might apply here.

### C

MBA changes direction in the second half of its brief, contending that if the Court overturns the *Paralyzed Veterans* rule, the D. C. Circuit's judgment should nonetheless be affirmed. That is so, MBA says, because the agency interpretation at issue—the 2010 Administrator's Interpretation—should in fact be classified as a legislative rule.

We will not address this argument. From the beginning, the parties litigated this suit on the understanding that the Administrator's Interpretation was—as its name suggests—an interpretive rule. Indeed, if MBA did not think the Administrator's Interpretation was an interpretive rule, then its decision to invoke the *Paralyzed Veterans* doctrine in attacking the rule is passing strange. After all, *Paralyzed Veterans* applied only to interpretive rules. Consequently, neither the District Court nor the D. C. Circuit considered MBA's current claim that the Administrator's Interpretation is actually a legislative rule. Beyond that, and more important still, MBA's brief in opposition to certiorari did not dispute petitioners' assertions—in their framing of the question presented and in the substance of their petitions—that the Administrator's Interpretation is an interpretive rule. Thus, even assuming MBA did not waive the argument below, it has done so in this Court. See this Court's Rule 15.2; *Carcieri* v. *Salazar*, 555 U. S. 379, 395–396 (2009).

\*    \*    \*

For the foregoing reasons, the judgment of the United States Court of Appeals for the District of Columbia Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 13–1041 and 13–1052

_____

THOMAS E. PEREZ, SECRETARY OF LABOR, ET AL.,
PETITIONERS
13–1041                 *v.*
MORTGAGE BANKERS ASSOCIATION ET AL.

JEROME NICKOLS, ET AL., PETITIONERS
13–1052                 *v.*
MORTGAGE BANKERS ASSOCIATION

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 9, 2015]

JUSTICE ALITO, concurring in part and concurring in the judgment.

I join the opinion of the Court except for Part III–B. I agree that the doctrine of *Paralyzed Veterans of America* v. *D. C. Arena L. P.*, 117 F. 3d 579 (CADC 1997), is incompatible with the Administrative Procedure Act. The creation of that doctrine may have been prompted by an understandable concern about the aggrandizement of the power of administrative agencies as a result of the combined effect of (1) the effective delegation to agencies by Congress of huge swaths of lawmaking authority, (2) the exploitation by agencies of the uncertain boundary between legislative and interpretive rules, and (3) this Court's cases holding that courts must ordinarily defer to an agency's interpretation of its own ambiguous regulations. See *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410 (1945). I do not dismiss these concerns, but the *Paralyzed Veterans* doctrine is not a viable cure for these prob-

lems. At least one of the three factors noted above, however, concerns a matter that can be addressed by this Court. The opinions of JUSTICE SCALIA and JUSTICE THOMAS offer substantial reasons why the *Seminole Rock* doctrine may be incorrect. See also *Christopher* v. *SmithKline Beecham Corp.*, 567 U. S. ___, ___–___ (2012) (slip op., at 13–14) (citing, *inter alia*, Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L. Rev. 612 (1996)). I await a case in which the validity of *Seminole Rock* may be explored through full briefing and argument.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 13–1041 and 13–1052

_____

THOMAS E. PEREZ, SECRETARY OF LABOR, ET AL.,
PETITIONERS
13–1041                    *v.*
MORTGAGE BANKERS ASSOCIATION ET AL.


JEROME NICKOLS, ET AL., PETITIONERS
13–1052                    *v.*
MORTGAGE BANKERS ASSOCIATION

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 9, 2015]

JUSTICE SCALIA, concurring in the judgment.

I agree with the Court's decision, and all of its reasoning demonstrating the incompatibility of the D. C. Circuit's *Paralyzed Veterans* holding with the Administrative Procedure Act. *Paralyzed Veterans of Am.* v. *D. C. Arena L.P.*, 117 F. 3d 579 (CADC 1997). I do not agree, however, with the Court's portrayal of the result it produces as a vindication of the balance Congress struck when it "weighed the costs and benefits of placing more rigorous . . . restrictions on the issuance of interpretive rules." *Ante,* at 9. That depiction is accurate enough if one looks at this case in isolation. Considered alongside our law of deference to administrative determinations, however, today's decision produces a balance between power and procedure quite different from the one Congress chose when it enacted the APA.

"The [APA] was framed against a background of rapid expansion of the administrative process as a check upon

administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *United States* v. *Morton Salt Co.*, 338 U. S. 632, 644 (1950). The Act guards against excesses in rule-making by requiring notice and comment. Before an agency makes a rule, it normally must notify the public of the proposal, invite them to comment on its shortcomings, consider and respond to their arguments, and explain its final decision in a statement of the rule's basis and purpose. 5 U. S. C. §553(b)–(c); *ante,* at 2.

The APA exempts interpretive rules from these requirements. §553(b)(A). But this concession to agencies was meant to be more modest in its effects than it is today. For despite exempting interpretive rules from notice and comment, the Act provides that "the *reviewing court* shall . . . interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." §706 (emphasis added). The Act thus contemplates that courts, not agencies, will authoritatively resolve ambiguities in statutes and regulations. In such a regime, the exemption for interpretive rules does not add much to agency power. An agency may use interpretive rules to *advise* the public by explaining its interpretation of the law. But an agency may not use interpretive rules to *bind* the public by making law, because it remains the responsibility of the court to decide whether the law means what the agency says it means.

Heedless of the original design of the APA, we have developed an elaborate law of deference to agencies' interpretations of statutes and regulations. Never mentioning §706's directive that the "reviewing court . . . interpret . . . statutory provisions," we have held that *agencies* may authoritatively resolve ambiguities in statutes. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984). And never mentioning §706's directive that the "reviewing court . . . determine

the meaning or applicability of the terms of an agency action," we have—relying on a case decided before the APA, *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410 (1945)—held that *agencies* may authoritatively resolve ambiguities in regulations. *Auer* v. *Robbins*, 519 U. S. 452, 461 (1997).

By supplementing the APA with judge-made doctrines of deference, we have revolutionized the import of interpretive rules' exemption from notice-and-comment rulemaking. Agencies may now use these rules not just to advise the public, but also to bind them. After all, if an interpretive rule gets deference, the people are bound to obey it on pain of sanction, no less surely than they are bound to obey substantive rules, which are accorded similar deference. Interpretive rules that command deference *do* have the force of law.

The Court's reasons for resisting this obvious point would not withstand a gentle breeze. Even when an agency's interpretation gets deference, the Court argues, "it is the court that ultimately decides whether [the text] means what the agency says." *Ante,* at 10–11, n. 4. That is not quite so. So long as the agency does not stray beyond the ambiguity in the text being interpreted, deference *compels* the reviewing court to "decide" that the text means what the agency says. The Court continues that "deference is not an inexorable command in all cases," because (for example) it does not apply to plainly erroneous interpretations. *Ibid.* True, but beside the point. Saying *all* interpretive rules lack force of law because plainly erroneous interpretations do not bind courts is like saying *all* substantive rules lack force of law because arbitrary and capricious rules do not bind courts. Of course an interpretive rule must meet certain conditions before it gets deference—the interpretation must, for instance, be reasonable—but once it does so it is every bit as binding as a substantive rule. So the point stands: By deferring to

interpretive rules, we have allowed agencies to make binding rules unhampered by notice-and-comment procedures.

The problem is bad enough, and perhaps insoluble if *Chevron* is not to be uprooted, with respect to interpretive rules setting forth agency interpretation of statutes. But an agency's interpretation of its own regulations is another matter. By giving that category of interpretive rules *Auer* deference, we do more than allow the agency to make binding regulations without notice and comment. Because the agency (not Congress) drafts the substantive rules that are the object of those interpretations, giving them deference allows the agency to control the extent of its notice-and-comment-free domain. To expand this domain, the agency need only write substantive rules more broadly and vaguely, leaving plenty of gaps to be filled in later, using interpretive rules unchecked by notice and comment. The APA does not remotely contemplate this regime.

Still and all, what are we to do about the problem? The *Paralyzed Veterans* doctrine is a courageous (indeed, brazen) attempt to limit the mischief by requiring an interpretive rule to go through notice and comment if it revises an earlier definitive interpretation of a regulation. That solution is unlawful for the reasons set forth in the Court's opinion: It contradicts the APA's unqualified exemption of interpretive rules from notice-and-comment rulemaking.

But I think there is another solution—one unavailable to the D. C. Circuit since it involves the overruling of one this Court's decisions (that being even a greater fault than merely ignoring the APA). As I have described elsewhere, the rule of *Chevron*, if it did not comport with the APA, at least was in conformity with the long history of judicial review of executive action, where "[s]tatutory ambiguities . . . were left to reasonable resolution by the Executive."

*United States* v. *Mead Corp.*, 533 U. S. 218, 243 (2001) (SCALIA, J., dissenting). I am unaware of any such history justifying deference to agency interpretations of its own regulations. And there are weighty reasons to deny a lawgiver the power to write ambiguous laws and then be the judge of what the ambiguity means. See *Decker* v. *Northwest Environmental Defense Center*, 568 U. S. \_\_\_, \_\_\_–\_\_\_ (2013) (SCALIA, J., concurring in part and dissenting in part) (slip op., at 1–7). I would therefore restore the balance originally struck by the APA with respect to an agency's interpretation of its own regulations, not by rewriting the Act in order to make up for *Auer*, but by abandoning *Auer* and applying the Act as written. The agency is free to interpret its own regulations with or without notice and comment; but courts will decide—with no deference to the agency—whether that interpretation is correct.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 13–1041 and 13–1052

_____

THOMAS E. PEREZ, SECRETARY OF LABOR, ET AL.,
PETITIONERS
13–1041 _v._
MORTGAGE BANKERS ASSOCIATION ET AL.


JEROME NICKOLS, ET AL., PETITIONERS
13–1052 _v._
MORTGAGE BANKERS ASSOCIATION

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[March 9, 2015]

JUSTICE THOMAS, concurring in the judgment.

I concur in the Court's holding that the doctrine first announced in _Paralyzed Veterans of America_ v. _D. C. Arena L. P._, 117 F. 3d 579 (CADC 1997), is inconsistent with the Administrative Procedure Act (APA), 5 U. S. C. §551 _et seq._, and must be rejected. An agency's substantial revision of its interpretation of a regulation does not amount to an "amendment" of the regulation as that word is used in the statute.

I write separately because these cases call into question the legitimacy of our precedents requiring deference to administrative interpretations of regulations. That line of precedents, beginning with _Bowles_ v. _Seminole Rock & Sand Co._, 325 U. S. 410 (1945), requires judges to defer to agency interpretations of regulations, thus, as happened in these cases, giving legal effect to the interpretations rather than the regulations themselves. Because this doctrine effects a transfer of the judicial power to an exec-

utive agency, it raises constitutional concerns.  This line of precedents undermines our obligation to provide a judicial check on the other branches, and it subjects regulated parties to precisely the abuses that the Framers sought to prevent.

I

The doctrine of deference to an agency's interpretation of regulations is usually traced back to this Court's decision in *Seminole Rock, supra*, which involved the interpretation of a war-time price control regulation, *id.,* at 411.  Along with a general price freeze, the Administrator of the Office of Price Administration had promulgated specialized regulations governing the maximum price for different commodities.  *Id.,* at 413.  When the Administrator brought an enforcement action against a manufacturer of crushed stone, the manufacturer challenged the Administrator's interpretation of his regulations.

The lower courts agreed with the manufacturer's interpretation, *id.,* at 412–413, but this Court reversed.  In setting out the approach it would apply to the case, the Court announced—without citation or explanation—that an administrative interpretation of an ambiguous regulation was entitled to "controlling weight":

> "Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.  The intention of Congress or the principles of the Constitution in some situations may be relevant in the first instance in choosing between various constructions.  But the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.,* at 413–414.

The Court then concluded that the rule "clearly" favored the Administrator's interpretation, rendering this discussion dictum. *Id.,* at 415–417.

From this unsupported rule developed a doctrine of deference that has taken on a life of its own.[1] It has been broadly applied to regulations issued by agencies across a broad spectrum of subjects. See, *e.g., Robertson* v. *Methow Valley Citizens Council*, 490 U. S. 332, 358–359 (1989) (forests); *Ehlert* v. *United States*, 402 U. S. 99, 104–105 (1971) (Selective Service); *INS* v. *Stanisic*, 395 U. S. 62, 72 (1969) (deportation); *Udall* v. *Tallman*, 380 U. S. 1, 16–17 (1965) (oil and gas leases). It has even been applied to an agency's interpretation of another agency's regulations. See *Pauley* v. *BethEnergy Mines, Inc.*, 501 U. S. 680, 696–699 (1991). And, it has been applied to an agency interpretation that was inconsistent with a previous interpretation of the same regulation. See *Long Island Care at Home, Ltd.* v. *Coke*, 551 U. S. 158, 170–171 (2007). It has been applied to formal and informal interpretations alike, including those taken during litigation. See *Auer* v. *Robbins*, 519 U. S. 452, 462 (1997). Its reasoning has also been extended outside the context of traditional agency regulations into the realm of criminal sentencing. See *Stinson* v. *United States*, 508 U. S. 36, 44–45 (1993) (concluding that the Sentencing Commission's commentary on its Guidelines is analogous to an agency interpretation of its own regulations, entitled to *Seminole Rock* deference).

The Court has even applied the doctrine to an agency interpretation of a regulation cast in such vague aspirational terms as to have no substantive content. See

---

[1] Although the Court has appeared to treat our agency deference regimes as precedents entitled to *stare decisis* effect, some scholars have noted that they might instead be classified as interpretive tools. See, *e.g.,* C. Nelson, Statutory Interpretation 701 (2011). Such tools might not be entitled to such effect. Because resolution of that issue is not necessary to my conclusion here, I leave it for another day.

*Thomas Jefferson Univ.* v. *Shalala*, 512 U. S. 504, 512–513 (1994); see also *id.,* at 518 (THOMAS, J., dissenting).

On this steady march toward deference, the Court only once expressly declined to apply *Seminole Rock* deference on the ground that the agency's interpretation was plainly erroneous.[2] In that case, we were faced with the predictable consequence of this line of precedents: An agency sought deference to an opinion letter that interpreted a permissive regulation as mandatory. See *Christensen* v. *Harris County*, 529 U. S. 576, 588 (2000). We rejected that request for deference as an effort, "under the guise of interpreting a regulation, to create *de facto* a new regulation." *Ibid.* This narrow limit on the broad deference given the agency interpretations, though sound, could not save a doctrine that was constitutionally infirm from the start. *Seminole Rock* was constitutionally suspect from the start, and this Court's repeated extensions of it have only magnified the effects and the attendant concerns.

───────────

[2] The Court has also twice expressly found *Seminole Rock* deference inapplicable for other reasons. *Christopher* v. *SmithKline Beecham Corp.*, 567 U. S. ___, ___–___ (2012) (slip op., at 13–14) ("[W]here, as here, an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute. . . . [W]hatever the general merits of *Auer* deference, it is unwarranted here"); *Gonzales* v. *Oregon*, 546 U. S. 243, 256–257 (2006) ("In our view *Auer* and the standard of deference it accords to an agency are inapplicable here. . . . The language the Interpretive Rule addresses comes from Congress, not the Attorney General, and the near equivalence of the statute and regulation belies the Government's argument for *Auer* deference").

Occasionally, Members of this Court have argued in separate writings that the Court failed appropriately to apply *Seminole Rock* deference, but in none of those cases did the majority opinions of the Court expressly refuse to do so. See *Ballard* v. *Commissioner*, 544 U. S. 40 (2005); *Allentown Mack Sales & Service, Inc.* v. *NLRB*, 522 U. S. 359 (1998); *Director, Office of Workers' Compensation Programs* v. *Greenwich Collieries*, 512 U. S. 267 (1994); *United States* v. *Swank*, 451 U. S. 571 (1981); *Peters* v. *Hobby*, 349 U. S. 331 (1955).

## II

We have not always been vigilant about protecting the structure of our Constitution.  Although this Court has repeatedly invoked the "separation of powers" and "the constitutional system of checks and balances" as core principles of our constitutional design, essential to the protection of individual liberty, see, *e.g., Stern* v. *Marshall*, 564 U. S. \_\_\_, \_\_\_–\_\_\_ (2011) (slip op., at 16–17) (internal quotation marks omitted), it has also endorsed a "more pragmatic, flexible approach" to that design when it has seemed more convenient to permit the powers to be mixed, see, *e.g., Nixon* v. *Administrator of General Services*, 433 U. S. 425, 442 (1977).  As the history shows, that approach runs the risk of compromising our constitutional structure.

### A

The Constitution's particular blend of separated powers and checks and balances was informed by centuries of political thought and experiences.  See M. Vile, Constitutionalism and the Separation of Powers 38, 168–169 (2d ed. 1998) (Vile).  Though the theories of the separation of powers and checks and balances have roots in the ancient world, events of the 17th and 18th centuries played a crucial role in their development and informed the men who crafted and ratified the Constitution.

Over a century before our War of Independence, the English Civil War catapulted the theory of the separation of powers to prominence.  As political theorists of the day witnessed the conflict between the King and Parliament, and the dangers of tyrannical government posed by each, they began to call for a clear division of authority between the two.  *Id.*, at 44–45, 48–49.  A 1648 work titled The Royalist's Defence offered perhaps the first extended account of the theory of the separation of powers: "[W]hilst the *Supreamacy*, the *Power* to Judge the Law,

and *Authority* to make new Lawes, are kept in *severall hands*, the known Law is *preserved*, but *united,* it is *vanished*, instantly thereupon, and *Arbytrary* and *Tyrannicall* power is introduced." The Royalist's Defence 80 (1648) (italics in original).

John Locke and Baron de Montesquieu endorsed and expanded on this concept. See Vile 63–64. They agreed with the general theory set forth in The Royalist's Defence, emphasizing the need for a separation of powers to protect individual liberty. J. Locke, Second Treatise of Civil Government §§143–144, p. 72 (J. Gough ed. 1947); Montesquieu, Spirit of the Laws bk. XI, ch. 6, pp. 151–152 (O. Piest ed., T. Nugent transl. 1949). But they also advocated a system of checks and balances to reinforce that separation. Vile 72–73, 102. For instance, they agreed that the executive should have the power to assemble and dismiss the legislature and to consent to laws passed by it. See Locke, *supra*, §§151, 156, at 75, 77–78; Montesquieu, Spirit of the Laws, at 157, 159. Montesquieu warned that "power should be a check to power" lest the legislature "arrogate to itself what authority it pleased . . . [and] soon destroy all the other powers." *Id.*, at 150, 157.

The experience of the States during the period between the War of Independence and the ratification of the Constitution confirmed the wisdom of combining these theories. Although many State Constitutions of the time included language unequivocally endorsing the separation of powers, they did not secure that separation with checks and balances, Vile 147, and actively placed traditional executive and judicial functions in the legislature, G. Wood, The Creation of the American Republic 1776–1787, pp. 155–156 (1969). Under these arrangements, state legislatures arrogated power to themselves and began to confiscate property, approve the printing of paper money, and suspend the ordinary means for the recovery

of debts. *Id.*, at 403–409.[3]

When the Framers met for the Constitutional Convention, they understood the need for greater checks and balances to reinforce the separation of powers. As Madison remarked, "experience has taught us a distrust" of the separation of powers alone as "a sufficient security to each [branch] [against] encroachments of the others." 2 Records of the Federal Convention of 1787, p. 77 (M. Farrand rev. 1966). "[I]t is necessary to introduce such a balance of powers and interests, as will guarantee the provisions on paper." *Ibid.* The Framers thus separated the three main powers of Government—legislative, executive, and judicial—into the three branches created by Articles I, II, and III. But they also created checks and balances to reinforce that separation. For example, they gave Congress specific enumerated powers to enact legislation, Art. I, §8, but gave the President the power to veto that legislation, subject to congressional override by a supermajority vote, Art. I, §7, cls. 2, 3. They gave the President the power to appoint principal officers of the United States, but gave the Senate the power to give advice and consent to those appointments. Art. II, §2, cl. 2. They gave the House and Senate the power to agree to adjourn for more than three days, Art. I, §5, cl. 4, but gave the President the power, "in Case of Disagreement between them," to adjourn the Congress "to such Time as he shall think proper." Art. II, §3, cl. 3. During the ratification debates, Madison argued that this structure represented "the great security" for liberty in the Constitution. The Federalist No. 51, p. 321

———————

[3] The practices of the time can perhaps best be summarized by the following commentary from a contemporaneous magazine: "[S]o many *legal infractions* of sacred right—so many public invasions of private property—so many wanton abuses of legislative powers!" Giles Hickory (Noah Webster), Government, The American Magazine, Mar. 1788, p. 206.

(C. Rossiter ed. 1961) (J. Madison).

To the Framers, the separation of powers and checks and balances were more than just theories. They were practical and real protections for individual liberty in the new Constitution. See *Mistretta* v. *United States*, 488 U. S. 361, 426 (1989) (SCALIA, J., dissenting) ("[The Constitution] is a prescribed structure, a framework, for the conduct of government. In designing that structure, the Framers *themselves* considered how much commingling [of governmental powers] was, in the generality of things, acceptable, and set forth their conclusions in the document"). The Judiciary—no less than the other two branches—has an obligation to guard against deviations from those principles. The *Seminole Rock* line of precedent is one such deviation.

### B

*Seminole Rock* raises two related constitutional concerns. It represents a transfer of judicial power to the Executive Branch, and it amounts to an erosion of the judicial obligation to serve as a "check" on the political branches.

### 1

When a party properly brings a case or controversy to an Article III court, that court is called upon to exercise the "judicial Power of the United States." Art. III, §1. For the reasons I explain in this section, the judicial power, as originally understood, requires a court to exercise its independent judgment in interpreting and expounding upon the laws.

Those who ratified the Constitution knew that legal texts would often contain ambiguities. See generally Molot, The Judicial Perspective in the Administrative State: Reconciling Modern Doctrines of Deference with the Judiciary's Structural Role, 53 Stan. L. Rev. 1, 20–21, and

n. 66 (2000); Nelson, Originalism and Interpretive Conventions, 70 U. Chi. L. Rev. 519, 525–526 (2003). As James Madison explained, "All new laws, though penned with the greatest technical skill and passed on the fullest and most mature deliberation, are considered as more or less obscure and equivocal . . . ." The Federalist No. 37, at 229.

The judicial power was understood to include the power to resolve these ambiguities over time. See *ibid.* Alexander Hamilton lauded this power, arguing that "[t]he interpretation of the laws is the proper and peculiar province of the courts." *Id.*, No. 78, at 467. It is undoubtedly true that the other branches of Government have the authority and obligation to interpret the law, but only the judicial interpretation would be considered authoritative in a judicial proceeding. Vile 360.

Although the Federalists and Anti-Federalists engaged in a public debate about this interpretive power, that debate centered on the dangers inherent in the power, not on its allocation under the Constitution. See, *e.g.,* Letters from The Federal Farmer XV (Jan. 18, 1788), in 2 The Complete Anti-Federalist 315–316 (H. Storing ed. 1981) (arguing that the interpretive power made the Judiciary the most dangerous branch). Writing as "Brutus," one leading anti-Federalist argued that judges "w[ould] not confine themselves to any fixed or established rules, but w[ould] determine, according to what appears to them, the reason and spirit of the constitution." Essays of Brutus (Jan. 31, 1788), in 2 *id.*, at 420. The Federalists rejected these arguments, assuring the public that judges would be guided "by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them." The Federalist No. 78, at 471 (A. Hamilton). Those rules included principles of interpretation that had been set out by jurists for centuries. See, *e.g.*, 2 S. von Pufendorf, De Officio Hominis Et Civis Juxta

Legem Naturalem Libri Duo 83–86 (1682) (F. Moore transl. 1927); see also 1 W. Blackstone, Commentaries on the Laws of England 59–61 (1765).

One of the key elements of the Federalists' arguments in support of the allocation of power to make binding interpretations of the law was that Article III judges would exercise independent judgment. Although "judicial independence" is often discussed in terms of independence from external threats, the Framers understood the concept to also require independence from the "internal threat" of "human will." P. Hamburger, Law and Judicial Duty 507, 508 (2008); see also The Federalist No. 78, at 465 (A. Hamilton) ("The judiciary . . . may truly be said to have neither FORCE nor WILL but merely judgment . . . "). Independent judgment required judges to decide cases in accordance with the law of the land, not in accordance with pressures placed upon them through either internal or external sources. Internal sources might include personal biases, while external sources might include pressure from the political branches, the public, or other interested parties. See Hamburger, *supra,* at 508–521.

The Framers made several key decisions at the Convention with these pressures in mind. For example, they rejected proposals to include a federal council of revision after several participants at the Convention expressed concern that judicial involvement in such a council would foster internal biases. Rufus King of Maryland, for example, asserted that "the Judges ought to be able to expound the law as it should come before them, free from the bias of having participated in its formation." 1 Records of the Federal Convention of 1787, at 98. Alexander Hamilton repeated these concerns in The Federalist, arguing that "the judges, who are to be interpreters of the law, might receive an improper bias from having given a previous opinion in their revisionary capacities" or "be induced to embark too far in the political views of [the Executive]"

from too much association with him. The Federalist No. 73, at 446; see also Hamburger, *supra,* at 508–512.

The Framers also created structural protections in the Constitution to free judges from external influences. They provided, for example, that judges should "hold their Offices during good Behaviour" and receive "a Compensation, which shall not be diminished during their Continuance in Office." Art. III, §1. Hamilton noted that such unequivocal language had been shown necessary by the experience of the States, where similar state constitutional protections for judges had not been "sufficiently definite to preclude legislative evasions" of the separation of the judicial power. The Federalist No. 79, at 472. Because "power over a man's subsistence amounts to a power over his will," he argued that Article III's structural protections would help ensure that judges fulfilled their constitutional role. *Ibid.* (emphasis deleted).

The Framers made the opposite choice for legislators and the Executive. Instead of insulating them from external pressures, the Constitution tied them to those pressures. It provided for election of Members of the House of Representatives every two years, Art. I, §2, cl. 1; and selection of Members of the Senate every six years, Art. I, §3, cl. 1. It also provided for the President to be subject to election every four years. Art. II, §1, cl. 1. "The President is [thus] directly dependent on the people, and since there is only *one* President, *he* is responsible. The people know whom to blame . . . ." See *Morrison* v. *Olson,* 487 U. S. 654, 729 (1988) (SCALIA, J., dissenting). To preserve that accountability, we have held that executive officers *must* be subject to removal by the President to ensure accountability within the Executive Branch. See *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.,* 561 U. S. 477, 495 (2010); see also *Morrison, supra,* at 709 (opinion of SCALIA, J.) ("It is not for us to determine, and we have never presumed to determine, how much of the

purely executive powers of government must be within the full control of the President. The Constitution prescribes that they *all* are").

Given these structural distinctions between the branches, it is no surprise that judicial interpretations are definitive in cases and controversies before the courts. Courts act as "an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority." Federalist No. 78, at 467 (A. Hamilton). The Legislature and Executive may be swayed by popular sentiment to abandon the strictures of the Constitution or other rules of law. But the Judiciary, insulated from both internal and external sources of bias, is duty bound to exercise independent judgment in applying the law.

Interpreting agency regulations calls for that exercise of independent judgment. Substantive regulations have the force and effect of law. See, *e.g., United States* v. *Mead Corp.*, 533 U. S. 218, 231–232 (2001).[4] Agencies and pri-

---

[4] These cases also raise constitutional questions about the distinction in administrative law between "substantive" (or "legislative") and interpretative rules. The United States Court of Appeals for the D. C. Circuit has defined a legislative rule as "[a]n agency action that purports to impose legally binding obligations or prohibitions on regulated parties" and an interpretative rule as "[a]n agency action that merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties." *National Mining Assn.* v. *McCarthy*, 758 F. 3d 243, 251–252 (2014). And our precedents make clear that administrative agencies must exercise only executive power in promulgating these rules. *Arlington* v. *FCC*, 569 U. S. ___, ___, n. 4 (2013) (slip op., at 13, n. 4). But while it is easy to see the promulgation of interpretative rules as an "executive" function—executive officials necessarily interpret the laws they enforce—it is difficult to see what authority the President has "to impose legally binding obligations or prohibitions on regulated parties." That definition suggests something much closer to the legislative power, which our Constitution does not permit the Executive to exercise in this manner. Because these troubling questions are not

vate parties alike can use these regulations in proceedings against regulated parties. See, *e.g.*, *Christopher* v. *SmithKline Beecham Corp.*, 567 U. S. \_\_\_, \_\_\_–\_\_\_ (2012) (slip op., at 6–7) (private party relying on Department of Labor regulations); *FCC* v. *Fox Television Stations, Inc.*, 567 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 6) (agency issuing notices of liability under regulations). Just as it is critical for judges to exercise independent judgment in applying statutes, it is critical for judges to exercise independent judgment in determining that a regulation properly covers the conduct of regulated parties. Defining the legal meaning of the regulation is one aspect of that determination.

*Seminole Rock* deference, however, precludes judges from independently determining that meaning. Rather than judges' applying recognized tools of interpretation to determine the best meaning of a regulation, this doctrine demands that courts accord "controlling weight" to the agency interpretation of a regulation, subject only to the narrow exception for interpretations that are plainly erroneous or inconsistent with the regulation. That deference amounts to a transfer of the judge's exercise of interpretive judgment to the agency. See 1 S. Johnson, Dictionary of the English Language 499 (4th ed. 1773) (defining "[d]efer" as "to leave to another's judgment"). But the agency, as part of the Executive Branch, lacks the structural protections for independent judgment adopted by the Framers, including the life tenure and salary protections of Article III. Because the agency is thus not properly constituted to exercise the judicial power under the Constitution, the transfer of interpretive judgment raises serious separation-of-powers concerns.

––––––––––

directly implicated here, I leave them for another case. See *Department of Transportation* v. *Association of American Railroads*, *ante,* at 19–22 (THOMAS, J., concurring in judgment).

2

*Seminole Rock* is constitutionally questionable for an additional reason: It undermines the judicial "check" on the political branches.  Unlike the Legislative and Executive Branches, each of which possesses several political checks on the other, the Judiciary has one primary check on the excesses of political branches.  That check is the enforcement of the rule of law through the exercise of judicial power.

Judges have long recognized their responsibility to apply the law, even if they did not conceive of it as a "check" on political power.  During the 17th century, for example, King James I sought to pressure Chief Justice Coke to affirm the lawfulness of his efforts to raise revenue without the participation of Parliament.  Hamburger, Law and Judicial Duty, at 200–201.  Coke sought time to confer with his fellow jurists to "make an advised answer according to law and reason." *Case of Proclamations*, 12 Co. Rep. 74, 75, 77 Eng. Rep. 1352, 1353 (K. B. 1611).  But the King's representative, Lord Chancellor Ellesmere, responded that "he would advise the Judges to maintain the power and prerogative of the King" and suggested that, "in cases in which there is no authority and precedent," the judiciary should "leave it to the King to order in it according to his wisdom." *Ibid.*  Coke famously responded, "[T]he King cannot change any part of the common law, nor create any offence by his proclamation, which was not an offence before, without Parliament." *Ibid.*  When James I later attempted to do just that, Coke declared the proclamations "'utterly against Law and reason, and for that void.'" Hamburger, *supra*, at 202.

The Framers expected Article III judges to engage in similar efforts, by applying the law as a "check" on the excesses of both the Legislative and Executive Branches.  See, *e.g.,*  3 J. Elliot, Debates in the Several Conventions on the Adoption of the Federal Constitution 553 (1863) (J.

Marshall) ("If [the Government of the United States] make a law not warranted by any of the powers enumerated, it would be considered by the judges as an infringement of the Constitution which they are to guard. . . . They would declare it void"); see also Vile 174. The Framers "contemplated [the Constitution], as a rule for the government of *courts*, as well as of the legislature." *Marbury* v. *Madison*, 1 Cranch 137, 179–180 (1803). Thus, if a case involved a conflict between a law and the Constitution, judges would have a duty "to adhere to the latter and disregard the former." The Federalist No. 78, at 468 (A. Hamilton); see also *Marbury*, 1 Cranch, at 178. Similarly, if a case involved an executive effort to extend a law beyond its meaning, judges would have a duty to adhere to the law that had been properly promulgated under the Constitution. Cf. *id.*, at 157–158 (considering the scope of the President's constitutional power of appointment). As this Court said long ago, "[T]he particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the constitution is void; and that *courts*, as well as other departments, are bound by that instrument." *Id.,* at 180.

Article III judges cannot opt out of exercising their check. As we have long recognized, "[t]he Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky* v. *Clinton*, 566 U. S. ___, ___ (2012) (slip op., at 5) (quoting *Cohens* v. *Virginia*, 6 Wheat. 264, 404 (1821)). This responsibility applies not only to constitutional challenges to particular statutes, see, *e.g., Shelby County* v. *Holder*, 570 U. S. ___, ___ (2013) (slip op., at 2), including those based on the separation of powers, *Free Enterprise Fund*, 561 U. S., at 501–502, but also to more routine questions about the best interpretation of statutes, see, *e.g., Whitfield* v. *United States*, 574 U. S. ___, ___–___ (2015) (slip op., at 2–3), or the compati-

bility of agency actions with enabling statutes, *Utility Air Regulatory Group* v. *EPA*, 573 U. S. ___, ___ (2014) (slip op., at 10). In each case, the Judiciary is called upon to exercise its independent judgment and apply the law.

But we have not consistently exercised the judicial check with respect to administrative agencies. Even though regulated parties have repeatedly challenged agency interpretations as inconsistent with existing regulations, we have just as repeatedly declined to exercise independent judgment as to those claims. Instead, we have deferred to the executive agency that both promulgated the regulations and enforced them. Although an agency's interpretation of a regulation might be the best interpretation, it also might not. When courts refuse even to decide what the best interpretation is under the law, they abandon the judicial check. That abandonment permits precisely the accumulation of governmental powers that the Framers warned against. See The Federalist No. 47, at 302 (J. Madison).

C

This accumulation of governmental powers allows agencies to change the meaning of regulations at their discretion and without any advance notice to the parties. It is precisely this problem that the United States Court of Appeals for the D. C. Circuit attempted to address by requiring agencies to undertake notice and comment procedures before substantially revising definitive interpretations of regulations. *Paralyzed Veterans, supra.* Though legally erroneous, the Court of Appeals' reasoning was practically sound. When courts give "controlling weight" to an administrative interpretation of a regulation—instead of to the *best* interpretation of it—they effectively give the interpretation—and not the regulation—the force and effect of law. To regulated parties, the new interpretation might as well be a new regulation.

These cases provide a classic example of the problem. The Fair Labor Standards Act of 1938 establishes federal minimum wage and overtime requirements, but exempts from these requirements "any employee engaged in a bona fide executive, administrative, or professional capacity . . . , or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary)." 29 U. S. C. §213(a)(1). The Department of Labor has accordingly promulgated regulations providing that "an employee whose primary duty is selling financial products does not qualify for the administrative exemption." 29 CFR §541.203(b) (2015).

Unsure whether certain mortgage-loan officers qualified as employees whose primary duty is selling financial products, the Mortgage Bankers Association asked the Department of Labor for advice. In 2006, the Department concluded that the officers are not employees whose primary duty is selling financial products. But in 2010, the Department reversed course, concluding exactly the opposite. If courts accord "controlling weight" to both the 2006 and 2010 interpretations, the regulated entities are subject to two opposite legal rules imposed under the same regulation.

This practice turns on its head the principle that the United States is "a government of laws, and not of men." *Marbury*, *supra*, at 163. Regulations provide notice to regulated parties in only a limited sense because their meaning will ultimately be determined by agencies rather than by the "strict rules and precedents" to which Alexander Hamilton once referred.[5]

_____

[5] The notice problem is exacerbated by agency departures from the procedures established for rulemaking in the APA. Although almost all rulemaking is today accomplished through informal notice and comment, the APA actually contemplated a much more formal process for most rulemaking. To that end, it provided for elaborate trial-like hearings in which proponents of particular rules would introduce

### III

Although this Court offered no theoretical justification for *Seminole Rock* deference when announcing it, several justifications have been proposed since.  None is persuasive.

### A

Probably the most oft-recited justification for *Seminole Rock* deference is that of agency expertise in administering technical statutory schemes.  Under this justification, deference to administrative agencies is necessary when a "regulation concerns 'a complex and highly technical regulatory program' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'"  *Thomas Jefferson Univ.,* 512 U. S., at 512.

This defense of *Seminole Rock* deference misidentifies the relevant inquiry.  The proper question faced by courts in interpreting a regulation is not what the best policy choice might be, but what the regulation means.  Because this Court has concluded that "substantive agency regulations have the 'force and effect of law,'" *Chrysler Corp.* v.

---

evidence and bear the burden of proof in support of those proposed rules.  See 5 U. S. C. §556.

Today, however, formal rulemaking is the Yeti of administrative law.  There are isolated sightings of it in the ratemaking context, but elsewhere it proves elusive.  It is somewhat ironic for the Court so adamantly to insist that agencies be subject to no greater procedures than those required by the APA when we have not been adamant in requiring agencies to comply with even those baseline procedures.  See *United States* v. *Florida East Coast R. Co.*, 410 U. S. 224, 237–238 (1973) (concluding that the APA's formal procedures, which were to apply "[w]hen rules are required by statute to be made on the record after opportunity for an agency hearing," §553(c), were not triggered by a statute that permitted an agency to engage in rulemaking only "'after [a] hearing'").

*Brown*, 441 U. S. 281, 295 (1979), such regulations should be interpreted like any other law. Thus, we should "assum[e] that the ordinary meaning of the regulation's language expresses" its purpose and enforce it "according to its terms." See *Hardt* v. *Reliance Standard Life Ins. Co.*, 560 U. S. 242, 251 (2010) (internal quotation marks omitted). Judges are at least as well suited as administrative agencies to engage in this task. Cf. *Marbury*, 1 Cranch, at 177 ("It is emphatically the province and duty of the judicial department to say what the law is"). Indeed, judges are frequently called upon to interpret the meaning of legal texts and are able to do so even when those texts involve technical language. See, *e.g., Barber* v. *Gonzales*, 347 U. S. 637, 640–643 (1954) (interpreting deportation statute according to technical meaning).

Fundamentally, the argument about agency expertise is less about the expertise of agencies in interpreting language than it is about the wisdom of according agencies broad flexibility to administer statutory schemes.[6] "But

––––––––––

[6]Many decisions of this Court invoke agency expertise as a justification for deference. This argument has its root in the support for administrative agencies that developed during the Progressive Era in this country. The Era was marked by a move from the individualism that had long characterized American society to the concept of a society organized for collective action. See A. Link, Woodrow Wilson and the Progressive Era 1910–1917, p. 1 (1954). That move also reflected a deep disdain for the theory of popular sovereignty. As Woodrow Wilson wrote before he attained the presidency, "Our peculiar American difficulty in organizing administration is not the danger of losing liberty, but the danger of not being able or willing to separate its essentials from its accidents. Our success is made doubtful by that besetting error of ours, the error of trying to do too much by vote." Wilson, The Study of Administration, 2 Pol. Sci. Q. 197, 214 (1887). In President Wilson's view, public criticism would be beneficial in the formation of overall policy, but "a clumsy nuisance" in the daily life of Government—"a rustic handling delicate machinery." *Id.,* at 215. Reflecting this belief that bureaucrats might more effectively govern the country than the American people, the progressives ushered in

policy arguments supporting even useful 'political inven-
tions' are subject to the demands of the Constitution which
defines powers and . . . sets out . . . how those powers are
to be exercised." *INS* v. *Chadha*, 462 U. S. 919, 945
(1983). Even in the face of a perceived necessity, the
Constitution protects us from ourselves. *New York* v.
*United States*, 505 U. S. 144, 187–188 (1992).

B

Another oft-recited justification for *Seminole Rock* def-
erence is that agencies are better situated to define the
original intent behind their regulations. See *Martin* v.
*Occupational Safety and Health Review Comm'n*, 499 U. S.
144, 152–153 (1991). Under this justification, "[b]ecause
the Secretary [of Labor] promulgates th[e] standards, the
Secretary is in a better position . . . to reconstruct the
purpose of the regulations in question." *Id.*, at 152.

This justification rings hollow. This Court has afforded
*Seminole Rock* deference to agency interpretations even
when the agency was not the original drafter. See *Pauley*,
501 U. S., at 696–698 (applying *Seminole Rock* deference
to one agency's interpretation of another agency's regula-
tions because Congress had delegated authority to both to
administer the program). It has likewise granted *Semi-
nole Rock* deference to agency interpretations that are
inconsistent with interpretations adopted closer in time to
the promulgation of the regulations. See, *e.g., Long Island
Care at Home*, 551 U. S., at 170–171.

Even if the scope of *Seminole Rock* deference more
closely matched the original-drafter justification, it would
still fail. It is the text of the regulations that have the
force and effect of law, not the agency's intent. "Citizens

_____

significant expansions of the administrative state, ultimately culminat-
ing in the New Deal. See generally M. Keller, Regulating a New
Economy: Public Policy and Economic Change in America, 1900–1933
(1990).

arrange their affairs not on the basis of their legislators' unexpressed intent, but on the basis of the law as it is written and promulgated." *Zuni Public School Dist. No. 89* v. *Department of Education*, 550 U. S. 81, 119 (2007) (SCALIA, J., dissenting). Cf. *Wyeth* v. *Levine*, 555 U. S. 555, 586–587 (2009) (THOMAS, J., concurring in judgment) (noting that only "federal standards . . . that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures"—not Congress' "purposes and objectives"—can become the "law of the land"). "To be governed by legislated text rather than legislators' intentions is what it means to be 'a Government of laws, not of men.'" *Zuni Public School Dist. No. 89*, *supra*, at 119 (SCALIA, J., dissenting). Only the text of a regulation goes through the procedures established by Congress for agency rulemaking. And it is that text on which the public is entitled to rely. For the same reasons that we should not accord controlling weight to postenactment expressions of intent by individual Members of Congress, see *Sullivan* v. *Finkelstein*, 496 U. S. 617, 631–632 (1990) (SCALIA, J., concurring in part), we should not accord controlling weight to expressions of intent by administrators of agencies.

C

A third asserted justification for *Seminole Rock* deference is that Congress has delegated to agencies the authority to interpret their own regulations. See, *e.g., Martin*, 499 U. S., at 151. The theory is that, "[b]ecause applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, . . . the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Ibid.*

This justification fails because Congress lacks authority

to delegate the power. As we have explained in an analogous context, "[t]he structure of the Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess." *Bowsher* v. *Synar*, 478 U. S. 714, 726 (1986). Similarly, the Constitution does not empower Congress to issue a judicially binding interpretation of the Constitution or its laws. Lacking the power itself, it cannot delegate that power to an agency.

To hold otherwise would be to vitiate the separation of powers and ignore the "sense of a sharp necessity to separate the legislative from the judicial power . . . [that] triumphed among the Framers of the new Federal Constitution." *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 221 (1995). As this Court has explained, the "essential balance" of the Constitution is that the Legislature is "possessed of power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' but the power of '[t]he interpretation of the laws' [is] 'the proper and peculiar province of the courts.'" *Id.,* at 222 (citation omitted; third brackets added). Although the Constitution imposes a duty on all three branches to interpret the laws within their own spheres, the power to create legally binding interpretations rests with the Judiciary. See *Marbury*, 1 Cranch, at 177, 179–180.

## D

A final proposed justification for *Seminole Rock* deference is that too much oversight of administrative matters would imperil the "independence and esteem" of judges. See, *e.g.,* Charles Evans Hughes, Speech before the Elmira Chamber of Commerce, May 3, 1907, in Addresses of Charles Evans Hughes, 1906–1916, p. 185 (2d ed. 1916). The argument goes that questions of administration are those which "lie close to the public impatience," *id.,* at 186, and thus the courts' resolution of such questions could

"expose them to the fire of public criticism," *id.,* at 187.

But this argument, which boils down to a policy judgment of questionable validity, cannot vitiate the constitutional allocation of powers. The Judicial Branch is separate from the political branches for a reason: It has the obligation to apply the law to cases and controversies that come before it, and concerns about the popular esteem of individual judges—or even the Judiciary as a whole—have no place in that analysis. Our system of Government could not long survive absent adherence to the written Constitution that formed it.

\*     \*     \*

Although on the surface these cases require only a straightforward application of the APA, closer scrutiny reveals serious constitutional questions lurking beneath. I have "acknowledge[d] the importance of *stare decisis* to the stability of our Nation's legal system." "But *stare decisis* is only an 'adjunct' of our duty as judges to decide by our best lights what the Constitution means." *McDonald* v. *Chicago*, 561 U. S. 742, 812 (2010) (THOMAS, J., concurring in part and concurring in judgment) (citation omitted). By my best lights, the entire line of precedent beginning with *Seminole Rock* raises serious constitutional questions and should be reconsidered in an appropriate case.