# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 11, 2015       Decided August 12, 2016

No. 14-1170

TILDEN MINING COMPANY, INC.,
PETITIONER

v.

SECRETARY OF LABOR AND FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION,
RESPONDENTS

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

*Ralph Henry Moore II* argued the cause for petitioner. With him on the briefs was *Patrick W. Dennison.*

*Sara L. Johnson*, Attorney, U.S. Department of Labor, argued the cause for respondents. With her on the brief was *W. Christian Schumann*, Counsel, Appellate Litigation. *John T. Sullivan*, Attorney, Mine Safety and Health Review Commission, entered an appearance.

Before: GARLAND, *Chief Judge*[*], MILLETT, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

---

[*] Chief Judge Garland was a member of the panel at the time the case was argued but did not participate in this opinion.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: As Benjamin Franklin knew, equipment that conducts electricity is safest when "grounded"—physically connected to the earth.[1] Among other things, grounding prevents exposed metal in equipment from remaining electrically charged in the event of a power failure, thereby preventing accidental shock or electrocution. Grounding works most effectively when every component of an electrical circuit is continuous and has low resistance. *See Secretary of Labor v. Tilden Mining Company, LC*, 36 F.M.S.H.R.C. 1965, 1967 (2014); *see generally* 8 McGraw-Hill Encyclopedia of Science & Technology 237–238 (6th ed. 1987). Those two features allow any built-up electrical charge to dissipate swiftly via a grounding conductor into the earth the moment a power failure occurs.

Miners operate all sorts of electrical equipment as part of their work. The Secretary of Labor accordingly exercised his authority under the Federal Mine Safety and Health Act of 1977, Pub. L. No. 95-164, 91 Stat. 1290, to promulgate regulations that require mine operators to test the continuity and resistance of "grounding systems" for mining equipment. 30 C.F.R. § 56.12028; *see generally* 30 C.F.R. Part 56, Subpart K. The question in this case is whether the Secretary properly determined that power cables and extension cords are regulated parts of those "grounding systems." We uphold the Secretary's decision because, under the regulations' plain language, power cables and extension cords are most naturally considered components of "grounding systems."

---

[1] *See generally* I. Bernard Cohen, *Benjamin Franklin's Science* 66–109 (1990).

**I**

**A**

The Federal Mine Safety and Health Act of 1977 requires the Secretary of Labor "to develop detailed mandatory health and safety standards to govern the operation of the Nation's mines." *Donovan v. Dewey*, 452 U.S. 594, 596 (1981); *see also* 30 U.S.C. § 811(a). The Act also created the Mine Safety and Health Administration within the Department to carry out the Secretary's mine-safety duties. 29 U.S.C. § 557a. Administration inspectors may issue citations to mine operators who fail to abide by the Department's standards. 30 U.S.C. § 814. Citations can result in civil penalties of up to $50,000 for each violation. *Id.* § 820(a)(1). Mine operators may contest any citations they receive before Department of Labor administrative law judges, who conduct hearings and make findings of fact. Mine operators can then appeal ALJ rulings to the Federal Mine Safety and Health Review Commission. *Id.* § 815(d). Commission decisions, in turn, may be reviewed in this court. *Id.* § 816(a)(1).

Pursuant to his statutory authority, the Secretary has promulgated mandatory standards designed to address and prevent electrical hazards at mines. Relevant here is a set of four regulations that requires mine owners to ground certain electrical devices and other objects to prevent electrical shock. First, "[a]ll metal enclosing or encasing electrical circuits shall be grounded or provided with equivalent protection." 30 C.F.R. § 56.12025. Second, "[m]etal fencing and metal buildings enclosing transformers and switchgear shall be grounded." *Id.* § 56.12026. Third, "[f]rame grounding or equivalent protection shall be provided for mobile equipment powered through trailing cables." *Id.* § 56.12027. Finally, 30 C.F.R. § 56.12028 directs that "[c]ontinuity and resistance of grounding systems shall be tested immediately after installation, repair, and modification;

and annually thereafter," and records of those tests must be preserved for federal inspection.

Since at least 1993, the Secretary's Program Policy Manuals have expressly applied the continuity and resistance testing requirement to power cables and extension cords, explaining that "[t]he grounding conductors in trailing cables, power cables, and cords which supply power to portable or mobile equipment should be tested more frequently than stationary grounding conductors." Mine Safety and Health Administration, Program Policy Manual Vol. IV (April 1993, Release IV-12) at 52. Indeed, even five years earlier in 1988, the Program Policy Manual had presumed that cables and extension cords were subject to testing, explaining that "[t]he annual test does not apply to grounding conductors in trailing cables, power cables and cords which supply power to portable or mobile equipment" because "[t]he grounding conductors in these cables require more frequent testing." Mine Safety and Health Administration, Program Policy Manual Vol. IV (July 1988, Release IV-1) at 52. Again, in 1994, the Manual underscored that "[g]rounding conductors in trailing cables, power cables, and cords that supply power to tools and portable or mobile equipment must be tested as prescribed in the regulation." Mine Safety and Health Administration, Program Policy Letter No. P94-IV-1 (Jan. 31, 1994) at 2. The Secretary restated that language verbatim in the 1996 and 2003 Program Policy Manuals. *See* Mine Safety and Health Administration, Program Policy Manual Vol. IV (February 2003, Release IV-21) at 45; Mine Safety and Health Administration, Program Policy Manual Vol. IV (April 1, 1996, Release IV-16) at 52.

**B**

In April 2008, a Mine Safety and Health Administration Inspector issued two citations to the Tilden Mine in Michigan for failure to perform continuity and resistance testing on

certain equipment and extension cords. Tilden contested those citations before an ALJ, arguing that power cables and extension cords do not fall within the regulatory term "grounding systems," and that even if they did, the Secretary's application of the term to extension cords and power cables was unlawful because that position was not adopted through notice-and-comment rulemaking. The ALJ upheld the citations, reasoning that, "[d]ue to their function and the importance of preventing electric shock to miners, continuity testing must be performed on all aspects of the grounding system, including grounding conductors in extension cords." J.A. 16.

The Commission affirmed. It held that "grounding systems" was an ambiguous term and that the Secretary's interpretation was reasonable and entitled to deference. J.A. 6. Specifically, the Commission reasoned:

> Conducting a continuity test assures that the equipment being used is connected directly to the ground prong, and that the grounding circuit is complete. A grounding system is only as protective as its weakest link, which is why it is critical to ensure that all the necessary components of the grounding system are fully functional, including extension cords and cables. Otherwise, the grounding system will cease to function.

*Id.* The Commission further explained that the Secretary's position does not unduly burden mine operators because testing is only required annually and upon "installation," 30 C.F.R. § 56.12028, which the Secretary has determined means only when "an extension cord or cable is first put into use, [not] every time the cord or cable is subsequently plugged in." J.A. 7 n.3.

The Commission held, secondly, that the Secretary's reading of his regulation did not have to go through notice-and-comment rulemaking because, whatever ambiguity the 1988 Manual's discussion of testing frequency might have created, no prior position of the Secretary had held that extension cords were exempt from testing. J.A. 8–9.

## C

Tilden timely petitioned for review. While that petition was pending, the Supreme Court decided *Perez v. Mortgage Bankers Association*, 135 S. Ct. 1199 (2015). *Mortgage Bankers* held that "[b]ecause an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule." *Id.* at 1206. In simple terms, the Court held that if an agency's interpretation of a statute or regulation does not require notice-and-comment rulemaking procedures in the first instance, a change in that interpretation does not require notice-and-comment rulemaking procedures merely because it is a change. In light of that decision, Tilden has appropriately abandoned its argument that any arguable change in the Secretary's interpretation between the 1988 and 1994 versions of the Program Policy Manual in and of itself required notice-and-comment rulemaking. *See* Oral Arg. Tr. 3–4.

## II

Tilden argues that the Secretary's application of the testing requirements for "grounding systems" to power cables and extension cords was an unreasonable interpretation of Department regulations because extension cords and power cables are "not logically included within the standard." Pet'r Br. 15. Tilden alternatively argues that the application of testing requirements to power cables and extension cords is a legislative, not an interpretive, rule that required the agency to

engage in notice-and-comment rulemaking. In Tilden's view, requiring the testing of cables and cords was legislative because it is a "substantive change" that is "not logically included within" the Secretary's regulations. *Id.* at 31. Tilden concedes, however, that if the testing requirement instead is a logical and reasonable reading of the regulation, that would "be the end of the case," Oral Arg. Tr. 16, since the Secretary's position would neither be unreasonable nor would it be a legislative rule requiring notice-and-comment rulemaking procedures.

Ordinarily, "[t]his Court affords great deference to an agency's interpretation of its own regulation." *Secretary of Labor v. Twentymile Coal Co.*, 411 F.3d 256, 260 (D.C. Cir. 2005). We afford such deference based on the Supreme Court's decisions in *Auer v. Robbins*, 519 U.S. 452 (1997), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945). However, we need not rely on *Auer* deference where an agency's interpretation is the fairest reading of a regulation. *See, e.g.*, *Talk America, Inc. v. Michigan Bell Telephone Co.*, 564 U.S. 50, 67–68 (2011) (Scalia, J., concurring) ("I have no need to rely on *Auer* deference, because I believe the FCC's interpretation is the fairest reading."); *cf. International Internship Program v. Napolitano*, 718 F.3d 986, 987 n.1 (D.C. Cir. 2013) ("Because we conclude that the agency's interpretation of the statute is the better reading, we need not determine whether the agency's interpretation is entitled to *Chevron* deference.").

In this case, the better and most natural reading of the regulatory text includes power cables and extension cords appended to electrical appliances as part of the regulated "grounding systems."

We begin, and for the most part end, with the text of the key regulation. *See In re England*, 375 F.3d 1169, 1177 (D.C. Cir. 2004). Section 56.12028 reads:

> Continuity and resistance of grounding systems shall be tested immediately after installation, repair, and modification; and annually thereafter. A record of the resistance measured during the most recent tests shall be made available on a request by the Secretary or his duly authorized representative.

30 C.F.R. § 56.12028.

The regulation then defines "electrical grounding [to] mean[] to connect with the ground to make the earth part of the circuit." 30 C.F.R. § 56.2. The term "grounding systems" thus encompasses all of the related parts of the electrical circuit—all of the parts in the system—that together are grounded to the earth. For that reason, extension cords and power cables are naturally understood to be components of the grounded electrical circuit. If the equipment is not plugged into an electrical power source through a cable or extension cord, there is no continuous electrical circuit and therefore no grounding system. On the other hand, when the cable or cord is plugged in, the entire functional point of the cable or cord is to facilitate the movement of electricity from the power source to the piece of equipment, which creates a continuous, grounded electrical circuit.

That makes the testing of power cables and extension cords textually logical. "A grounding system is only as protective as its weakest link," so it is "critical to ensure that all the necessary components of the grounding system are fully functional, including extension cords and cables." J.A. 6 (Commission decision). As a Department of Labor inspector elaborated during the agency proceedings:

> The idea behind grounding is to protect the people who use metal-encased equipment from electric shock. * * * If an extension cord is being used, it, too, must be grounded for the same reasons that the

> metal-encased equipment itself should be grounded. The extension cord has now extended the circuit to the end of the extension cord. Conducting a continuity test assures one that the extension cord is connected directly to the ground prong and thus, the grounding circuit is complete, including the extension cord.

*Id.* at 79. In short, the fairest reading of the text mirrors its purpose: miners cannot be protected from electrical shock if a necessary component of a grounded electrical circuit has high resistance or is not continuous.

Tilden argues that "the terms extension cord or power cable are not found in the standard." Pet'r Br. 16. True enough. But outlets, power sources, and other conductors of electricity are not mentioned by name either, yet Tilden does not and could not dispute that they are indispensable components of a grounding system. What is critical is that the cords and cables fall within the natural compass of the phrase "grounding system," an expansive term that includes multiple constituent components. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 529 (2007) ("On its face, the definition [of 'air pollutant'] embraces all airborne compounds of whatever stripe."); *CSX Transportation, Inc. v. Alabama Dep't of Revenue*, 562 U.S. 277, 284 (2011) (Though "the statute [does not] place any matters within, or exclude any matters from, the term's ambit, * * * the meaning of 'tax' is expansive.").

The Secretary's Program Policy Manual confirms that "grounding systems" encompasses power cables and extension cords through its identification of categories of devices that are included within "grounding systems." The 2003 Manual (like all preceding iterations) explains that "[g]rounding systems typically include" three components: (i) "grounding electrodes," (ii) "grounding electrode conductors," and (iii) "equipment grounding conductors."

Mine Safety and Health Administration, Program Policy Manual Vol. IV (February 2003, Release IV-21) at 44. As the name suggests, grounding electrodes are the end device in the system where the grounding occurs: they are "usually driven rods connected to each other by suitable means, buried metal, or other effective methods located at the source, to provide a low resistance earth connection." *Id.* The grounding electrodes then connect to "grounding electrode conductors," which in turn connect to "equipment grounding conductors." *Id.* And, most relevantly here, "equipment grounding conductors" are defined as "the conductors used to connect the metal frames or enclosures of electrical equipment to the grounding electrode conductor." *Id.*

Power cables and extension cords, at a minimum, qualify as equipment grounding conductors: they are part of a series of conductors that link electrical equipment (through attachment to its outside metal frame or its enclosure) to the grounding electrode conductor—a connection that typically occurs at a circuit breaker or fuse box. That grounding electrode conductor then links up directly to the grounding electrode in the earth. Voilà—a grounding system.

At oral argument, Tilden argued that extension cords are grounding electrode conductors. *See* Oral Arg. Tr. 7. No matter. Either way the cords are a recognized component of a "grounding system" under the regulation.

Tilden also argues that interpreting "grounding systems" to include extension cords and power cables does not comport with the broader regulatory scheme. But Tilden's structural objections do not hold up. *First*, Tilden says that, because the rule requires testing "after installation," 30 C.F.R. § 56.12028, the Secretary's position would mean that power cables and extension cords have to be tested every single time they are plugged in. Not so. The Secretary has interpreted "installation" in this context to "only require[] that continuity

and resistance testing be done when an extension cord or cable is first put into use, as opposed to every time the cord or cable is subsequently plugged in."  J.A. 7 n.3; *see also* Supp. App. 47 (documenting Secretary's position before the Commission).  That is because the threat a power cable or extension cord poses to a grounding system derives not from being plugged in improperly, but from internal wiring that is flawed or damaged by vibration, flexing, or corrosive environments like those found in mines.  Accordingly, testing the integrity of the installed wiring need not occur every time the cord is plugged in.

Changing tacks, Tilden argues (Pet'r Br. 19) that extension cords and power cables require no "installation." But the "installation" referenced in the regulation is of the "grounding system," 30 C.F.R. § 56.12028, and in that context the cords are installed when they are first connected to equipment and conductors creating a grounding system.

Anyhow, both of those arguments go to the ambiguity of the term "installation" not "grounding systems."  Whatever ambiguity or confusion Tilden perceives in the Secretary's interpretation of "installation," that does nothing to detract from the logical compass of the phrase "grounding systems."

*Second*, Tilden argues that the application of the "grounding systems" language to extension cords and power cables makes no sense because the regulation requires both continuity and resistance testing of grounding systems, yet only continuity—not resistance—testing is required for power cables and extension cords.  No again.  In fact, testing resistance is very much necessary for extension cords because a high resistance would mean that "it would take longer for [a] message to get back to the circuit breaker or fuse box * * * when the equipment is energized through [an] electrical fault."  Oral Arg. Tr. 31–32.  Moreover, the Secretary explained that only resistance—not continuity—is directly

recorded during testing, because the resistance reading simultaneously shows whether the electrical circuit is continuous. *Id.* at 32–34.

*Third*, Tilden argues that power cables and extension cords, as temporary pieces of equipment, do not fit comfortably within the regulations' categories of permanent pieces of equipment for which direct grounding is required: (i) "[a]ll metal enclosing or encasing electrical circuits," 30 C.F.R. § 56.12025, (ii) "[m]etal fencing and metal buildings enclosing transformers and switchgear," *id.* § 56.12026, and (iii) "mobile equipment powered through trailing cables," *id.* § 56.12027. But those provisions identify which equipment must be connected to the ground; they do not purport to list every object that must be tested as part of a grounding system.

Moreover, the fact that the "mobile equipment powered through trailing cables," 30 C.F.R. § 56.12027, *can* be detached from electrical systems—a point Tilden conceded at oral argument, *see* Oral Arg. Tr. 14—means that Tilden's proposed distinction between temporary and permanent installations does not hold together.

*Finally*, Tilden argues that the plain meaning of the term "grounding systems" cannot include extension cords and power cables because the industry did not understand that term to include those devices. But a regulation's ambit comes from the natural import of its text. Disavowals by those on the receiving end of regulation cannot, by themselves, alter a regulation's natural meaning.

## III

In sum, because the fairest reading of the regulation embraces power cables and extension cords used as part of an electrical grounding system, the Secretary's reading of the regulation was reasonable and non-legislative, making notice-

and-comment rulemaking unnecessary. The petition for review is denied.

*So ordered.*