# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 19, 2015   Decided August 7, 2015

No. 12-5411

GROSSMONT HOSPITAL CORPORATION, DOING BUSINESS AS
SHARP GROSSMONT HOSPITAL, ET AL.,
APPELLANTS

v.

SYLVIA MATHEWS BURWELL, SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01201)

*Robert L. Roth* argued the cause for appellants. With him on the briefs was *John R. Hellow*.

*Sydney Foster*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Ronald C. Machen*, *Jr*., U.S. Attorney at the time the brief was filed, and *Michael S. Raab*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: MILLETT, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Appellants, California hospitals, sought reimbursement under the Medicare program for so-called "bad claims." Payment was denied because the claims were submitted to Medicare without first being submitted to the State of California for a determination of any payment responsibility it may have for the claims. The appellants were denied relief in administrative proceedings. The district court affirmed. We affirm the district court.

## BACKGROUND

The Medicare program pays for certain medical care provided primarily to eligible elderly and disabled persons. Under the program, when a hospital participating in the program incurs costs in providing services to a Medicare patient, those costs are borne in part by the patient through the payment of deductibles and co-insurance. *See* 42 U.S.C. § 1395e; 42 C.F.R. § 409.80 *et seq.* Generally, the remaining costs are reimbursed by the Medicare program to the hospital through fiscal intermediaries, which are typically private insurance companies. *See* 42 U.S.C. § 1395h (2000). The Medicaid program is a cooperative federal-state program to provide medical care for eligible low-income individuals. The program is jointly funded by federal and state governments. In order for a state to qualify for federal funding, the Secretary of Health and Human Services (hereinafter "Secretary") must approve the state's Medicaid plan, which sets out, *inter alia*, covered medical services. *See* 42 U.S.C. §§ 1396a, 1396b.

Some patients are eligible for both Medicare and Medicaid (known as "dual eligibles"). When this occurs Medicare is the primary payor. State Medicaid plans often mandate that the

state Medicaid agency pay for part or all of the Medicare deductibles and coinsurance amounts incurred in connection with treating these dual eligibles. But if under its Medicaid plan a state is not obligated to pay such deductibles or coinsurance amounts, then these amounts can be included as "bad debt" under Medicare, and thus qualify as reimbursable to the hospital by the federal government. Pursuant to agency regulations, for a bad debt to be reimbursable the hospital must, *inter alia*, be able to establish that reasonable collection efforts were made.

Prior to 1994, California's Medicaid plan, known as Medi-Cal, provided for payment of dual eligibles' Medicare deductibles and co-insurance. On May 1, 1994, however, Medi-Cal unilaterally decided to stop making these payments. In 1996, the Secretary and Medi-Cal reached an agreement under which Medi-Cal's payments for Medicare deductibles and co-insurance would continue, subject to a payment ceiling and retroactive to May 1, 1994. However, for a period of years after this agreement was reached Medi-Cal continued to automatically set its payment responsibility for dual eligibles to zero. Consequently, in 1998 the Secretary and California reached another agreement under which Medi-Cal would reprocess all claims made between May 1994 and March 1999.

Appellants Grossmont Hospital Corporation and four other California hospitals (hereinafter "Grossmont" or "the hospitals") provided certain health services to dual eligibles for the relevant time period, May 1, 1994, through June 30, 1998. During this time, Grossmont's fiscal intermediary and Medi-Cal implemented a system that was intended to automatically transmit from the intermediary to Medi-Cal all of Grossmont's claims for payment of dual eligibles' deductibles and co-insurance. However, the system did not always work properly, and consequently some of Grossmont's claims were not transmitted to Medi-Cal. After Medi-Cal reprocessed the claims

in its system for May 1994 through March 1999, it issued lump-sum payments in 1999, including to Grossmont. Grossmont subsequently realized that some of its claims were not included in its lump-sum payments. One of the hospitals sent the state a letter concerning the missing claims and a few telephone calls were made to the state, but there is no evidence in the administrative record that the hospitals took any other steps to obtain state determinations of payment responsibility for the missing claims. Grossmont eventually produced its own estimates of the missing claims. Grossmont submitted these estimates to its intermediary, seeking payment, but the intermediary determined that such documentation was not appropriate. In 2006, Grossmont sent a letter to the state with a request to process an attached sample of the missing claims, but the state denied the request because the claims were not submitted in a timely manner.

Grossmont appealed the intermediary's determination to the Provider Reimbursement Review Board (hereinafter "Board"). The Board reversed the intermediary's determination, concluding that the intermediary had sufficient information to determine the amounts that Medi-Cal was not obligated to pay. Joint Appendix ("JA") 58-70.

The Secretary, through the Administrator for the Centers for Medicare and Medicaid Services, then reviewed the Board's decision. The Secretary reversed the Board's decision, observing that under a longstanding policy Medicare would not reimburse a hospital for dual eligibles' unpaid deductible and co-insurance amounts unless the hospital first billed the state Medicaid agency ("must bill policy") and obtained a determination from the state of its payment responsibility ("mandatory state determination"). Here, the Secretary concluded, there had been no state determination made on the missing claims and therefore the claims were not reimbursable.

JA 35-56.

Grossmont then appealed the Administrator's decision to the district court. The parties cross-moved for summary judgment. In a thorough Memorandum Opinion, *Grossmont Hosp. Corp. v. Sebelius*, 903 F. Supp. 2d 39 (D.D.C. 2012) ("*Grossmont I*"), the district court granted the Secretary's motion for summary judgment, affirming the Secretary's decision that the claims were not reimbursable.

Grossmont now appeals the district court's decision.

STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo* and review the Secretary's decision under the standard of the Administrative Procedure Act. *See, e.g., St. Luke's Hosp. v. Thompson*, 355 F.3d 690, 693-94 (D.C. Cir. 2004). We may set aside the Secretary's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence in the administrative record." 5 U.S.C. § 706(2)(A), (E); *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994). The Secretary's interpretation of her own regulations is entitled to "substantial deference" and "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted).

DISCUSSION

Grossmont argues that the mandatory state determination policy violates the bad debt moratorium; that the Secretary's refusal to pay Grossmont's claims based on the mandatory state determination policy is arbitrary and capricious; and that

Grossmont's claims must be paid under Joint Signature Memorandum 370.

## A. The bad debt moratorium

Grossmont questions the validity of the mandatory state determination policy. According to Grossmont, the long-standing policy of the Secretary was an "alternative documentation" policy, under which hospitals had the burden to show that they were entitled to the Medicare bad debts claimed, but were not required to submit bills to the state Medicaid program. Grossmont contends that the alternative documentation policy was confirmed in 1995 when the Secretary issued instructions in the Provider Reimbursement Manual, Part II § 1102.3L, which stated that hospitals can document a state's obligation for bad debts by supplying either a Medicaid remittance advice form or alternative documentation of the state's lack of responsibility for payment.

Even though § 1102.3L was deleted by the Secretary in 2003, it is Grossmont's contention that the alternative documentation policy was in effect for the relevant time period, i.e., May 1994 through June 1998. It was not until a case decision in 2000, Grossmont asserts, that the Secretary sought for the first time to impose a mandatory state determination policy to limit the "alternative documentation" policy. *See California Hospitals 91-91 Outpatient Crossover Bad Debts Group v. Blue Cross and Blue Shield Association/Blue Cross of California/Blue Cross of Omaha/ Aetna Life Insurance Company*, Adm. Dec. (Oct. 31, 2000), JA 254–265. Grossmont argues that this attempt in 2000 to limit the application of the long-standing alternative documentation policy to the hospitals' claims must be rejected as a violation of the statutory bad debt moratorium. The moratorium was enacted by Congress in 1987 and prohibits making any change to any policy in effect at the

time of its enactment with respect to bad debt payments. *See* Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4008(c), 101 Stat. 1330. In short, Grossmont claims that the mandatory state determination policy violates the bad debt moratorium and therefore the policy is invalid.

The district court refused to consider Grossmont's Bad Debt Moratorium argument, finding that Grossmont waived the argument by failing to raise it in the administrative proceedings below. *See Grossmont I*, 903 F. Supp. 2d at 48. Grossmont argues that the district court erred in its finding because (a) the Secretary first raised the moratorium in her decision below, thus opening the door to the issue, (b) the Secretary did not object in the district court to Grossmont's moratorium argument, thereby waiving any objection to Grossmont's waiving it, and (c) the Secretary fully briefed the moratorium issue below. We do not find these arguments persuasive. We agree with the district court that this issue will not be considered now as Grossmont was required to "raise [the] issue with [the] agency before seeking judicial review." *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 962 (D.C. Cir. 2007). Grossmont makes no claim to raising this issue in the administrative proceedings. We conclude that Grossmont has failed to preserve its challenge that the mandatory state determination policy violates the bad debt moratorium.

\*   \*   \*   \*   \*   \*

Grossmont goes on to argue that in addition to violating the moratorium, the Secretary's effort to limit the alternative documentation policy must be rejected because it is a change in policy that must be adopted in a notice and comment rule. Grossmont further argues that even if the Secretary could lawfully limit the alternative documentation policy, that limitation could not be applied to its claims because doing so

would have an unlawful retroactive effect. We will not consider these arguments, however, because as with the bad debt moratorium issue discussed above, Grossmont did not raise these arguments in the administrative proceedings, and has thus failed to preserve them.

## B. Arbitrary and capricious

Grossmont argues that even if the Secretary could lawfully apply the mandatory state determination policy, doing so under the facts of this case would be arbitrary and capricious and not based on substantial evidence. This is so, according to Grossmont, because the only purpose for the mandatory state determination policy is to assure that the Secretary does not pay for Medicare co-payments that are the responsibility of the state. Grossmont argues that that concern does not arise here because, first, Medi-Cal made the only determination necessary to show that Medicare owes the amounts the hospitals claim. In support of this argument, Grossmont contends that in issuing the two lump-sum retroactive payments, the Secretary showed that she had already made the determination that the relevant patients were eligible for Medi-Cal when the services were provided. This determination by Medi-Cal, Grossmont argues, was the only determination necessary to establish Medi-Cal's obligation for the claims at issue; the rest was grade school arithmetic. Second, Grossmont asserts that the determination by the hospitals of Medi-Cal's payment obligation for the claims at issue was made using the same methodology that the Secretary used to determine Medi-Cal's payment obligation for the lump-sum claims.

In response, the Secretary argues that she properly applied the must bill policy here. The Secretary asserts that she reasonably refused to accept Grossmont's estimates of Medi-Cal's responsibility in lieu of Medi-Cal's own determinations of

those amounts. The Secretary states that she never agreed that Grossmont's estimates were accurate. The Secretary further states that she has not taken a position on the accuracy of the estimates because such a task is administratively impractical. Finally, the Secretary states that she has reasonably concluded that the state is the best source of Medicaid eligibility and state payment information necessary to calculate properly the state's payment responsibility. Taking all of these factors into consideration, the Secretary argues that the application of the must bill policy here is not arbitrary or capricious. We agree.

In her decision, the Secretary stated that:

> The policy requiring a provider to bill the State and receive a determination on that claim, where the State is obligated either by statute or under the terms of its plan to pay all, or any part of the Medicare deductible or coinsurance amounts, is consistent with the general statutory and regulatory provisions relating specifically to the payment of bad debts and generally to the payment of Medicare reimbursement.

JA 48 (emphasis deleted). In particular the Secretary noted that pursuant to 42 C.F.R. § 413.89(e), to be allowable a bad debt must meet the following criteria:

> (1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

> (2) The provider must be able to establish that reasonable collection efforts were made.

> (3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established there was no likelihood of recovery at any time in the future.

The Secretary further noted that under Section 310 of the Provider Reimbursement Manual, § 413.89(e)'s second criterion requirement of a "reasonable collection effort" includes "*the issuance of a bill* on or shortly after discharge or death of the beneficiary *to the party responsible for the patient's personal financial obligations . . . .*" JA 43–44 (emphasis added by the Secretary). And with respect to the third criterion, the Secretary explained that "[a] fundamental requirement to demonstrate that an amount is, in fact, unpaid and uncollectible, is to bill the responsible party." JA 48. We hold that it is sensible for the Secretary to require that the state determine in the first instance the Medicaid eligibility of the claims and the appropriate amount of state payment owed because state policies vary widely and the state will have all of the necessary information under its Medicaid system.

We have previously instructed that when reviewing "the Secretary's interpretation of her own regulations, we apply a still more deferential standard than that afforded under *Chevron* [*U.S.A. v. NRDC*, 467 U.S. 837 (1984)]. Provided an agency's interpretation of its own regulation does not violate the constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Nat'l Medical Enters. v. Shalala*, 43 F.3d 691, 696–97 (D.C. Cir. 1995) (internal quotation marks and citation omitted). At least three Justices of the Supreme Court have expressed misgivings concerning enhanced deference. *See Perez v. Mortgage Bankers Assn*, 135 S. Ct. 1199, 1210–13 (2015) (Alito, J., concurring in part and concurring in the judgment); *id.* at 1213 (Thomas, J., concurring in the judgment); and *id.* at 1211 (Scalia, J., concurring in the judgment). We need not embroil ourselves in that controversy, since there is a

simpler approach for resolution of the question.

Ultimately, our review is governed by statute. "Judicial review of an agency's interpretation of its own regulations is governed by 5 U.S.C. § 706(2)(A), which requires courts to set aside agency action that is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Edwards, Elliott, & Levy, Federal Standards of Review 199 (2d ed. 2013). This standard of review relies on *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998), and *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). Under this standard, we afford "substantial deference" to an agency's views. *Allentown Mack*, 522 U.S. at 377; *Thomas Jefferson Univ.*, 512 U.S. at 512. We will defer to the agency's interpretation "unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.*, 512 U.S. at 512. There is no indication that the Secretary's interpretation is contrary to law or to the agency's intent at the time of the adoption, and we uphold it.

Having upheld the Secretary's interpretation of law under the *Thomas Jefferson University* standard, we easily uphold its application to the claims at issue. Medi-Cal was not timely billed for the claims at issue, and consequently the Secretary disallowed the claims because the state determination requirement of the must bill policy was never fulfilled. We conclude that as applied in this case, the Secretary's state determination requirement was not arbitrary or capricious.

We have noted that under *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943), "with limited exception, the law does not allow us to affirm an agency decision on a ground other than that relied upon by the agency." *Manin v. NTSB*, 627 F.3d 1239, 1243 (D.C. Cir. 2011). One exception: "when there is not the

slightest uncertainty as to the outcome of a proceeding on remand, courts can affirm an agency decision on grounds other than those provided in the agency decision." *Id.* at 1243 n.1 (internal quotation marks and citation omitted). As the Secretary argued in the district court, the must bill policy encompasses two requirements, i.e., a requirement to bill the state Medicaid program for the bad debt claims as well as a requirement to obtain the state's determination as to its financial responsibility on those claims. *See Grossmont*, 903 F. Supp. 2d at 49. Although the Secretary relied only on the state determination requirement for her disposition, she stated that "the record thus supports a conclusion that these claims were not in the States's system, that is, they were not billed . . . ." JA 54. We conclude that an independent basis for affirming the Secretary's disallowance of Grossmont's claims is the failure of Grossmont to timely bill Medi-Cal for those claims.

We note that because Grossmont never timely submitted claims to Medi-Cal, we need not decide whether the Secretary acts arbitrarily and capriciously if she refuses to allow claims as bad debt if a recalcitrant state refuses to issue state determinations of payment responsibility despite reasonably diligent efforts to obtain them.

## C. Joint Signature Memorandum 370

Finally, Grossmont argues that its claims must be paid under Joint Signature Memorandum 370 (JSM 370). Grossmont notes that after repealing Provider Reimbursement Manual, Part II (PRM-II) § 1102.3L in 2003, the Secretary in 2004 issued JSM 370, which "held harmless" bad debt claims where the intermediary "followed the now-obsolete Section § 1102.3L instructions for cost reporting periods prior to January 1, 2004." *See* Appellants' Br. 54. Under the hold harmless provision of JSM-370, reimbursements were allowed using other

documentation in lieu of billing the state. In her decision the Secretary held that the hospitals did not meet the hold harmless provisions of JSM-370. JA 55. Grossmont argues that it was arbitrary and capricious for the Secretary to have made the two lump-sum payments but then refuse to hold the hospitals harmless for the claims at issue when (1) the hospitals provided documentation for these claims that followed the same process followed in making the lump-sum payments, and (2) the intermediary stipulated that the hospitals supplied sufficient documentation to support their methodology for determining the bad debt amounts for each year under appeal. And furthermore, argues Grossmont, JSM-370 is properly read as a concession by the Secretary that PRM-II § 1102.3L was valid and legally enforceable even after it was deleted from the PRM, and that hospitals could rely on it.

We note that pursuant to JSM-370, reimbursement was not allowed using other documentation if, for cost reporting periods prior to January 1, 2004, the provider's intermediary required the provider to bill the state. Contrary to Grossmont's argument, the Secretary found that the lump-sum payments were consistent with the must bill policy because they were "based on claims (bills) submitted to the Medical agency . . . upon which the State made determinations of its obligation prior to Medicare allowing the bad debt." JA 52 n.19. Other evidence in the record establishes that the intermediary never allowed Grossmont to rely on documentation of Medi-Cal's payment responsibility that was not produced by Medi-Cal itself, and the intermediary also never instructed Grossmont that it was not required to bill Medi-Cal or obtain determinations from Medi-Cal of its payment responsibility. *See, e.g.,* JA 132, at 137:16-138:19; JA 133, at 143:6-13; JA 137, at 158:4-159:24; JA 141, at 175:3-21. Accordingly, the Secretary's conclusion that the hold harmless provision does not apply is supported by substantial evidence and is not arbitrary or capricious.

## CONCLUSION

The judgment of the district court is affirmed.

*It is so ordered.*