# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 22, 2021          Decided August 10, 2021

No. 20-5227

NEW LIFECARE HOSPITALS OF NORTH CAROLINA, LLC, DOING
BUSINESS AS LIFECARE HOSPITALS OF NORTH CAROLINA, ET
AL.,
APPELLANTS

v.

XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY,
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00237)

———

*Jason M. Healy* argued the cause and filed the briefs for
appellants.

*Dennis Fan*, Attorney, U.S. Department of Justice, argued
the cause for appellee. With him on the brief were *Brian M.
Boynton*, Acting Assistant Attorney General, and *Alisa B.
Klein*, Attorney.

Before: HENDERSON, WILKINS and WALKER, *Circuit
Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Appellants are four long-term care hospitals located in North Carolina, Pennsylvania, Texas, and Louisiana. The hospitals treat patients who are dually eligible for the Medicare and Medicaid programs. In 2008, the hospitals were denied reimbursement by the Secretary of Health and Human Services for "bad debts"—*i.e.*, unpaid coinsurances and deductibles owed by patients. The Secretary denied reimbursement on the grounds that the hospitals failed to comply with the "must-bill" policy, which requires providers to first seek payment from Medicaid before seeking reimbursement from Medicare for the bad debts of patients covered by both programs. The hospitals sought judicial review of the reimbursement denial, and the District Court granted summary judgment to the Secretary. For the reasons explained below, we affirm the District Court.

**I**

**A**

Medicare is a federally funded program that reimburses healthcare providers for delivering medical care to qualifying elderly and disabled individuals. *See* 42 U.S.C. § 1395 *et seq.* Medicaid is a cooperative federal-state program—administered by states, and subject to federal guidelines—that pays for medical care provided to eligible low-income individuals. *See* 42 U.S.C. § 1396 *et seq.* Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS") on behalf of the Secretary of Health and Human Services. Notably, because Medicare does not cover the full cost of care, patients are responsible for paying deductible and coinsurance fees for inpatient hospital services received. *See* 42 U.S.C. § 1395e; 42 C.F.R. §§ 409.82, 409.83.

This case concerns several hospitals that treat "dual-eligible" patients—*i.e.*, individuals who qualify for both Medicare and Medicaid. Often, these patients are unable to afford the coinsurances and deductibles required of them under Medicare. When that happens, state Medicaid programs may fill the gap by requiring the state Medicaid agency to cover the unpaid fees. *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079, 1081 (D.C. Cir. 2015). The Medicaid statute requires states to determine what cost-sharing liability they bear for dual-eligible patients. *See* 42 U.S.C. § 1396a(a)(10)(E)(i).

If the state does not cover the deductibles and coinsurances of dual-eligible patients through Medicaid, then those missing payments can be designated as "bad debts," and healthcare providers can seek reimbursement through Medicare. *See* 42 C.F.R. § 413.89; *see also* CMS Provider Reimbursement Manual Part 1, § 322, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021929. Medicare reimburses bad debts to prevent hospitals from shifting the cost of Medicare-related services onto non-Medicare patients. *See* 42 U.S.C. § 1395x(v)(1)(A) (requiring the Secretary to regulate in such a way that "the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered").

Before a provider can seek reimbursement of bad debt from Medicare, CMS requires the provider to demonstrate that "reasonable . . . efforts were made" to collect payment from the party responsible for the bill. 42 C.F.R. § 413.89(e)(2). In its Provider Reimbursement Manual ("PRM"), CMS explains what a "reasonable collection effort" means. *See* Provider Reimbursement Manual § 310. Section 310 of the PRM explains that providers must "issu[e] . . . a bill . . . to the party responsible" for the patient's payments. CMS Provider

Reimbursement Manual § 310. Section 322 of the PRM further explains that when a state Medicaid program is "obligated either by statute or under the terms of its plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts *are not allowable* as bad debts under Medicare." *Id.* § 322 (emphasis added). Medicare thus allows "[a]ny portion of such deductible or coinsurance amounts that *the State is not obligated to pay* [to] be included as a bad debt[.]" *Id.* (emphasis added).

CMS addressed the bad debt reimbursement policy in a joint memorandum ("JSM") issued to all fiscal intermediaries in 2004. At that time, CMS explained that:

> In order to fulfill the requirement that a provider make a "reasonable" collection effort with respect to the deductibles and co-insurance amounts owed by dual-eligible patients, our bad debt policy requires the provider to bill the patient or entity legally responsible for the patient's bill before the provider can be reimbursed for uncollectible amounts.

J.A. 238. The 2004 memorandum referred to this pre-reimbursement requirement as the "must-bill" policy, and it outlined the steps a provider must take to comply with the policy before seeking bad debt reimbursement for dual-eligible patients:

> [I]n those instances where the state owes none or only a portion of the dual-eligible patient's deductible or co-pay, the unpaid liability for the bad debt is not reimbursable to the provider by Medicare until the provider bills the State, and the State refuses payment (with a State Remittance Advice).

*Id.* In short, CMS's must-bill policy requires hospitals to: (1) bill the state Medicaid program to determine whether Medicaid will cover the bad debts first, and (2) obtain a document known as a "remittance advice" ("RA") indicating whether the state "refuses payment," before seeking reimbursement under Medicare. *Id.*; *see also Grossmont*, 797 F.3d at 1086.

Bad debt reimbursement claims are ultimately processed by private insurance companies (fiscal intermediaries) serving as contractors for CMS. *See* 42 U.S.C. §§ 1395h(a), 1395u(a), 1395kk-1. Healthcare providers file annual cost reports with these contractors, 42 C.F.R. § 413.20(b), and the contractors issue notices indicating which payments Medicare will cover, *id.* § 405.1803(a). Providers can then appeal reimbursement decisions from the contractors to the Provider Reimbursement Review Board ("Board"), an administrative tribunal within HHS. 42 U.S.C. § 1395*oo*(a). The Board's decision is final unless the Secretary—acting through the CMS Administrator—"reverses, affirms, or modifies" the Board. *Id.* § 1395*oo*(f)(1); *see also* 42 C.F.R. § 405.1875(a). From there, a provider may seek judicial review by filing a civil action in district court. 42 U.S.C. § 1395*oo*(f); 42 C.F.R. § 405.1877(b).

Relevant here, Congress froze any changes to CMS's bad debt reimbursement policy in 1987. *Grossmont*, 797 F.3d at 1083; *see also* Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4008(c), 101 Stat. 1330–55. This freeze, known as the "Bad Debt Moratorium," prevents CMS from making "any change in the policy in effect on August 1, 1987, with respect to payment" for "unpaid deductible and coinsurance amounts." Pub. L. No. 100-203, § 4008(c).

**B**

Appellants ("the hospitals") are long-term care facilities in North Carolina, Pennsylvania, Texas, and Louisiana. In April 2008, the hospitals were denied over $3 million in bad debt

reimbursement claims they submitted to CMS contractors. The contractors denied the claims on the grounds that the hospitals failed to comply with the must-bill policy. During the relevant time period, the hospitals were not enrolled in Medicaid and were thus unable to bill their respective state Medicaid programs. Central to this appeal, the hospitals claim that CMS contractors previously reimbursed bad debt claims *without* requiring proof that the hospital followed the must-bill policy. According to the hospitals, contractors only began enforcing the policy against them in April 2008.

The hospitals appealed the denial of reimbursement to the Board. The Board upheld the contractors' decisions for half of the hospitals, but reversed as to the other half. With respect to the hospitals in Louisiana and Texas, the Board found that they had "made a business decision" not to enroll in Medicaid, and that nothing prevented them from complying with the must-bill policy except for their own decision not to enroll in Medicaid. As to the hospitals in North Carolina and Pennsylvania, the Board found that those hospitals were not permitted to enroll in their state Medicaid programs during the relevant period, and were thus unable to bill Medicaid through no fault of their own. As a result, the Board ordered the contractors to accept an alternative form of documentation (something other than the RA) and reconsider the reimbursement claims.

The CMS Administrator took up review of the Board's decision. The parties filed comments for the Administrator, *see* 42 C.F.R. § 405.1875, but the hospitals failed to raise one argument at issue in this appeal—namely, that CMS violated Congress's 1987 Bad Debt Moratorium by suddenly enforcing the must-bill policy in 2008.

The Administrator partially reversed the Board and denied all of the hospitals' reimbursement claims. The Administrator reasoned that the must-bill policy applies to all hospitals, regardless of Medicaid enrollment status, because state

Medicaid programs are required to allow limited enrollment for the purpose of complying with the must-bill policy. J.A. 729–30. The Administrator also noted that if a state refuses to allow a hospital to enroll and thereby comply with the must-bill policy, then the hospital's recourse is to "take legal action with the[] state[]." J.A. 730.

The hospitals filed suit in the District Court, raising several challenges to CMS's application of the must-bill policy. The hospitals did not challenge the must-bill policy *per se*. J.A. 109. Rather, they challenged CMS's sudden enforcement of the policy in April 2008—an enforcement which they claim violated the Medicare Act, the Administrative Procedure Act, and the Bad Debt Moratorium. J.A. 30–32.

The parties cross-moved for summary judgment. The District Court granted summary judgment to the Secretary, finding that most of the hospitals' challenges failed because the hospitals did not prove CMS changed its application of the must-bill policy. The District Court also declined to reach the hospitals' argument that CMS violated the Bad Debt Moratorium, because the hospitals did not raise it before the Administrator. The hospitals filed a motion for reconsideration, arguing that it was both clear error and fundamentally unfair to preclude judicial review of a claim not presented to the Administrator so long as the claim was developed before the Board. After a hearing, the District Court denied the motion, holding again that the hospitals waived the Bad Debt Moratorium argument by failing to present it at all stages of administrative review. The hospitals timely appealed.

## II

The hospitals argue that the Administrator's decision was unlawful for several reasons, and they ask us to reverse the District Court's grant of summary judgment to the Secretary. We review *de novo* the District Court's summary judgment

decision. *Grossmont*, 797 F.3d at 1082. But because the District Court reviewed an administrative decision, "our task is the same as that performed by the district judge. In other words, we review the administrative record to determine whether the agency's decision was arbitrary and capricious, and whether its findings were based on substantial evidence." *Forsyth Mem'l Hosp., Inc. v. Sebelius*, 639 F.3d 534, 537 (D.C. Cir. 2011) (citing *Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997)). We ask whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

According to the hospitals, CMS abruptly changed its policy and began enforcing the must-bill requirement against the hospitals in April 2008, resulting in the denial of $3 million in reimbursement claims. The hospitals contend that this sudden enforcement violated the Medicare Act and the APA. We address each argument in turn.

## A

The hospitals first argue that the Administrator's decision violated the Medicare Act, 42 U.S.C. § 1395hh(a)(2). They reason that the sudden enforcement of the must-bill policy in April 2008 amounted to an interpretive rule, and the Medicare Act requires notice-and-comment rulemaking for changes in interpretive rules. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (holding that the Medicare Act does not incorporate the APA's exception to notice-and-comment rulemaking for interpretive rules).[1] The hospitals also argue

---

[1] The Medicare Act, 42 U.S.C. § 1395*oo*(f)(1), incorporates the APA's standard of review. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

that this interpretive rule was arbitrary and capricious under the APA, because it represented an abrupt change in policy with no reasoned explanation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

The problem for the hospitals is that they identify no change in CMS policy taking place in 2008. As noted above, CMS outlined its must-bill policy in a 2004 joint memorandum ("JSM") sent to all intermediary contractors. The hospitals do not challenge that memorandum; at oral argument, counsel for the hospitals explained that the only challenge here is to CMS's "decision to impose the remittance advice requirement on [the hospitals] beginning in April 2008." Oral Arg. Recording 5:45–6:05. The hospitals presume that CMS somehow altered the must-bill policy in 2008 or issued a new interpretive rule suddenly enforcing the policy against them, but the Administrator determined otherwise based on the record.

First, the Administrator found that there was no evidence of a change in agency policy in 2008: Prior to 2008, "no statement in the JSM, related PRM sections, or prior Administrator decisions" exempted the hospitals from the must-bill policy. J.A. 731. Second, the Administrator found that intermediary contractors may have reimbursed bad debts in the past without enforcing the must-bill policy ("without [requiring] appropriate documentation"), but even so, the actions of contractors did not set agency policy. *Id.* In other words, a failure by contractors to properly enforce the must-bill policy against the hospitals in years past did "not constitute an explicit or affirmative agency action on policy." *Id.* The Administrator found that even if the hospitals were previously reimbursed without adhering to the must-bill policy, evidence of those reimbursements was consistent with the conclusion that the contractors must have erred when reviewing and auditing previous claims. *See id.* As the Administrator explained: "[I]t is not always possible to review every item of

the cost report every year . . . . Such an error also does not demonstrate that CMS has abandoned or changed a policy." *Id.* The Administrator concluded that prior failures of contractors did not "relieve [a hospital] of its responsibility to follow the rules and regulations of CMS." *Id.*

On appeal, the hospitals point to nothing in the record to undermine the Administrator's determination. Instead, the hospitals assume that the actions of contractors signaled a change in agency policy in 2008. *See* Appellants' Br. at 15 (referring to "CMS's change in interpretation of the must-bill policy"); *id.* at 16–19 ( "CMS changed a substantive legal standard . . . ."); *id.* at 23 ("CMS abruptly changed its policy . . . ."). Here, as in the District Court, the hospitals rely primarily upon a set of statements from their Vice President for Reimbursement, who testified that "[p]rior to the years at issue, the intermediaries did not require . . . an RA," and "that was the audit treatment up until April of 2008." J.A. 616. The Vice President also stated that contractors "started requiring a valid . . . RA with a valid denial code" in April 2008, *id.*, and even though CMS issued a joint memorandum outlining the must-bill policy in 2004, the contractors "accepted documentation just supporting Medicaid eligibility" between 2004 and 2008, *id.* at 618. The hospitals also cite a letter sent by the hospitals to an auditor in March 2008 with alternative documentation (not an RA), along with redacted copies of forms showing patient Medicaid eligibility. *See* Appellants' Br. at 21; J.A. 298. None of this evidence undermines the Administrator's finding: While contractors may have failed to properly audit the hospitals' must-bill compliance before April 2008, those errors do not amount to a change in CMS policy.

In addition, the hospitals argue that the District Court should have followed *Select Specialty Hospital-Denver, Inc. v. Azar*, 391 F. Supp. 3d 53 (D.D.C. 2019). In *Select*, the district court held that CMS was "required, under the Medicare Act . .

. to conduct notice-and-comment rulemaking" before imposing the "must-bill policy and the RA requirement" on a group of "non-Medicaid-participating providers." 391 F. Supp. 3d at 67. There, as here, a group of hospitals that participated in Medicare but not Medicaid challenged the denial of their reimbursement claims for dual-eligible bad debts. *Id.* at 55. On cross-motions for summary judgment, the district court held for the hospitals. *Id.* at 56. But *Select* involved a different administrative record. As the District Court correctly noted here, its review of the Administrator's decision is "limited [to] and confined by the record in front of it." *New LifeCare Hosps. of N. Carolina LLC v. Azar*, 416 F. Supp. 3d 11, 22 (D.D.C. 2019), *reconsideration denied*, 466 F. Supp. 3d 124 (D.D.C. 2020). "It is black-letter administrative law that in an Administrative Procedure Act case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks and brackets removed). The record before us does not indicate a change in agency policy in 2008.

Because we conclude that the Administrator's finding of no change in CMS policy was supported by substantial evidence, we reject the hospitals' arguments that CMS violated the Medicare Act or the APA by changing an interpretive rule in 2008.

**B**

The hospitals next argue that the District Court should have considered whether the Administrator's decision violated the Bad Debt Moratorium. The District Court held that this issue was waived by the hospitals' failure to exhaust it at the administrative level, because the hospitals did not raise the argument to the Administrator despite raising it before the Board.

As noted above, the must-bill policy has two requirements: 1) a requirement to bill the state Medicaid agency, and 2) a requirement to obtain an RA. Here, the Board found that the first requirement predates the Bad Debt Moratorium, and the Board declined to reach whether the second requirement violates the Moratorium. *See* J.A. 707 ("[T]he Board finds that pre-1987 bad debt policy in the PRM clearly established that providers have an obligation to bill 'the responsible party.'"); J.A. 709 n.49 (citing "examples of pre-1987 agency statements and Board cases applying CMS' bad debt policy"); J.A. 709 n.48 ("[T]he Board need not address . . . whether the CMS' position that the 'must bill' policy necessarily includes obtaining an RA from a state even when that state has no responsibility violates the Bad Debt Moratorium."). The Board's finding was not disturbed by the Administrator. Although the Administrator provided several reasons for denying the hospitals' claims, at least one of the reasons was the hospitals' "failure to timely bill the State." J.A. 729; *see also* J.A. 728 ("[T]here are two types of situation[s] under which the Providers *did not bill* and receive a remittance advice from the respective State in which they were located in this case." (emphasis added)); *see also* J.A. 726 (citing *Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782 (9th Cir. 2003), and noting that "unpaid liability for the bad debt is not reimbursable until the provider bills the State and the State refuses payment, all of which is demonstrated through a Remittance Advice").

On appeal, the hospitals do not argue that the billing requirement in fact violates the Moratorium. Rather, they argue that the RA requirement—the second half of the must-bill policy—violates the Moratorium, and that the District Court should have addressed this issue. *See* Appellants' Br. at 28. But the Government points out that we need not reach this issue, because the hospitals never complied with the billing requirement which the Board found predates 1987. Gov't Br.

at 24–26.  In their reply brief, the hospitals argue they did properly comply with the billing requirement.  *See* Appellants' Reply Br. at 17, 23.  This argument is not timely, not only because it first appears in the reply brief, but also because it was not raised in the District Court, as it is not our role to resolve a factual dispute on appeal.  "[W]e are a court of review, not of first view."  *Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 789 (D.C. Cir. 2019) (internal quotation marks and brackets omitted).

The hospitals correctly note that other district courts have found the RA requirement violates the Bad Debt Moratorium based on different administrative records.  *See Kindred Healthcare, Inc. v. Azar*, No. 1:18-cv-650, 2020 WL 3574614, at *8 (D.D.C. July 1, 2020); *Select*, 391 F. Supp. 3d at 59, *reconsideration denied*, No. 1:10-cv-1356, 2019 WL 5697076 (D.D.C. Nov. 4, 2019), *appeal dismissed*, No. 20-5004, 2020 WL 768266 (D.C. Cir. Jan. 28, 2020) ("The Secretary cites nothing in the record articulating an absolute RA requirement before the issuance of JSM-370 . . . ."); *Mercy Gen. Hosp. v. Azar*, 410 F. Supp. 3d 63, 77 (D.D.C. 2019).  But we agree with the Government that these cases are inapplicable given the record before us.  Here, the Board found that the hospitals did not comply with the billing requirement that predates the Moratorium, and the hospitals have not pointed to anywhere in the record where they challenged these findings for lack of substantial evidence.  Under the circumstances of this case, the District Court did not need to address whether the RA requirement violates the Bad Debt Moratorium.[2]

---

[2] The hospitals also argue that the District Court made this Bad Debt Moratorium argument reviewable by ordering the hospitals to address, in a sur-reply, "whether the must-bill policy, both *generally and as applied* to non-Medicaid-participating providers, violates the Bad Debt Moratorium."  Minute Order, *New LifeCare Hosps. Of N. Carolina LLC v. Cochran*, No. 1:17-cv-237 (D.D.C. July 26, 2019)

14

**C**

The hospitals' remaining arguments fare no better. First, the hospitals contend that the Administrator's decision violated Medicare's prohibition against cost-shifting. As noted above, the Medicare Act prohibits shifting costs of Medicare services onto non-Medicare patients. It also prohibits shifting costs from non-Medicare services onto the Medicare program. *See* 42 U.S.C. § 1395x(v)(1)(A) ("[T]he necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs[.]"). The hospitals argue that the Administrator's decision to deny them over $3 million in reimbursement for Medicare patients violates this anti-cost-shifting provision.

We agree with the District Court that this argument amounts to a claim that "the Administrator [cannot] deny any bad debt reimbursement claims—no matter how frivolous." *New LifeCare Hosps.*, 416 F. Supp. 3d at 18. And we decline to adopt that reading of the anti-cost-shifting provision. While the Medicare Act prohibits shifting costs onto non-Medicare patients, it also "authoriz[es] the Secretary to refuse to reimburse costs when the provider has *failed to 'furnish such information as the Secretary may request* in order to determine the amounts due such provider.'" *Id.* (citing 42 U.S.C. § 1395g(a) (emphasis added)).

_____

(emphasis added). It is unclear why the District Court ordered the sur-reply, but the hospitals do not challenge the "must-bill policy . . . generally," and the District Court ultimately noted that in its opinion. *See New LifeCare Hosps.*, 416 F. Supp. 3d at 18. The hospitals challenge only the April 2008 decision on their reimbursement claims.

Second, the hospitals argue that the Administrator's decision impermissibly requires them to enroll in Medicaid, despite the fact that Medicaid participation is voluntary. But, as the Government notes, Medicare participation is also voluntary. Here, the Administrator explained that the decision of a provider not to enroll in Medicaid does not relieve a state of its responsibility to share the costs of dual-eligible patients' bad debts. *See* J.A. 729 ("The non-Medicaid enrollment status of a provider does not change the legal responsibilities that result from the dual eligible status of a Medicare beneficiary for which a State may be liable for cost sharing[.]"). If a hospital treats dual-eligible patients, incurs bad debts, and seeks reimbursement of those debts from Medicare, then the hospital must contend with the statutory and regulatory requirements for obtaining reimbursement. *See, e.g.*, 42 U.S.C. § 1396a(a)(10)(E)(i) (requiring a state Medicaid plan to provide "for making medical assistance available for [M]edicare cost-sharing (as defined in section 1396d(p)(3) of this title) for qualified [M]edicare beneficiaries"). We do not mean to understate the practical burden on the hospitals here, but as the Administrator's decision explained, these requirements stand apart from—and do not dictate—a provider's decision to participate in Medicaid.

Third, the hospitals contend that the Administrator's decision was arbitrary and capricious or unsupported by substantial evidence for a few reasons. They argue that the Administrator failed to consider that the hospitals had "no way to comply with CMS's new interpretation of the must-bill policy" because they were prevented from enrolling in Medicaid by certain states. Appellants' Br. at 47–48. But the Administrator considered this argument and reasonably explained its reasons for rejecting it. J.A. 728 ("[N]one of the Providers were enrolled in Medicaid. The Providers alleged they could not conform to the [m]ust bill policy . . . ."). Specifically, the Administrator noted that states are obligated

by the Medicaid statute to process claims for dual-eligible patients and to determine their cost-sharing liability for those patients. J.A. 730. As a result, the Administrator concluded that providers should "take legal action with their states" if a state prohibits enrollment for the purpose of dual-eligible billing. *Id.* Most importantly, the Administrator found that even in the two states where the hospitals were previously excluded from Medicaid enrollment, those states permitted enrollment "in order to bill and receive RAs" after the hospitals "reach[ed] out and explain[ed] the circumstances to NC and PA State officials." J.A. 730. Thus, while it was "no doubt frustrating" for the hospitals to enroll in Medicaid, it was not impossible. *New LifeCare Hosps.*, 416 F. Supp. 3d. at 23.

Next, the hospitals claim it was arbitrary and capricious for the Administrator to require compliance with the must-bill policy by some providers while certain other providers are exempt from the policy. Specifically, the hospitals point to community mental health centers in California which are exempt from bad debt billing because the state does not license them, and they are thus unable to enroll in Medicaid. The hospitals also point to institutions for mental disease ("IMDs"), which receive an exemption from the bad debt policy. *See id.* at 23–24. But the Administrator reasonably explained why these exemptions differ from the hospitals' case. Unlike the California community mental health centers, the hospitals *are* licensed by their states. J.A. 732. Also unlike the hospitals, the IMDs serve patients who, due to age, are excluded from Medicaid payments by statute and regulation. *Id.*; *see also* 42 U.S.C. § 1396d(a)(14); 42 C.F.R. §§ 435.1009(a)(2), 441.13(a)(2). The hospitals, in contrast, are capable of enrolling in Medicaid and obtaining reimbursement for their patients' bad debts under the terms of the must-bill policy.

The hospitals' final arbitrary-and-capricious claims fail for the same reasons addressed above. They contend that the

Administrator's decision was arbitrary and capricious because it departed from how CMS treated reimbursement requests before April 2008. But again, the hospitals cite only to their own Vice President's testimony about reimbursements received before 2008—and as the Administrator found, this evidence did not establish that CMS changed policy in 2008. The hospitals' final argument, relying on *FCC v. Fox Television*, is that CMS changed a policy or past practice on which the hospitals had relied, because CMS "consistently exempted Hospitals from its must-bill policy" in years past. Appellants' Br. at 54; *see also Fox Television*, 556 U.S. at 515. The Administrator found no such exemption in the record, and as explained above, the hospitals have pointed to nothing to undermine the Administrator's determination. *See* J.A. 731. We therefore conclude that the Administrator's decision was not arbitrary and capricious.

### III

For the foregoing reasons, we affirm the judgment of the District Court.

*So ordered.*